**CELITE CORPORATION v. DICALITE CO.***
No. 8310.

Circuit Court of Appeals, Ninth Circuit.
April 18, 1938.

*Rehearing denied June 6, 1938.

Leonard S. Lyon, Richard F. Lyon, Irwin L. Fuller, and C. A. Miketta, all of Los Angeles, Cal. (Walter H. Borcherding, of New York City, of counsel), for appellant.

Swanwick, Donnelly & Proudfit, of Los Angeles, Cal. (Frederick Bachman and Theodore S. Kenyon, both of New York City, Charles E. Townsend, of San Francisco, Cal., and Charles E. Donnelly, of Los Angeles, Cal., of counsel), for appellee.

Before WILBUR, MATHEWS, and HANEY, Circuit Judges.

WILBUR, Circuit Judge.

On March 17, 1931, appellant brought suit in equity against appellee for infringement of letters patent No. 1,502,547 granted

July 22, 1924, to R. Calvert, K. L. Dern, and G. A. Alles, for a process of preparing diatomaceous earth and for the product so prepared.

Appellee answered alleging that the appellant's patent is invalid because anticipated by prior United States and foreign patents, and, also, because the claimed invention disclosed by the patent was described in printed publications and in use more than two years prior to the application for its issuance. It was also alleged that the patent was void for want of a "full, clear, concise, or exact description of the alleged invention." As a further defense appellee alleged that appellant "comes into this Court with unclean hands and seeks equity without doing equity" because of its unfair competition. Appellee filed a counterclaim alleging diversity of citizenship, that the amount involved in this controversy is more than $3,000, exclusive of interest and costs, and that the amount of damage to the appellee caused by the said unlawful acts of appellant "is impossible of accurate ascertainment, but is in excess of the sum of three thousand dollars ($3,000) exclusive of interest and costs." It prayed that an injunction issue restraining appellant from coercing and intimidating the trade and especially appellee's customers by threats of litigation or litigation because of their use and sale of diatomaceous earth products, and for an accounting of all "gains, profits and damages" that had accrued to appellant from the alleged unlawful acts and of all damages appellee had sustained by the alleged acts.

In its answer to the counterclaim appellant denied that it committed the alleged unlawful acts alleged in the counterclaim and denied that the amount of damage to the business of the appellee was "in excess of the sum of three thousand dollars ($3,000) exclusive of interest and costs or any other sum or sums whatsoever. * * *" 

In a decree entered October 31, 1935, the trial court held claims 1, 2, 11, 12, 13, 14, 18, and 21 of the patent in suit invalid; claims 5, 6, and 9 valid, but limited to the use of the particular chemicals specified in the patent and held that the appellee had not infringed any of the claims of the patent. The court held that the appellant, through the Johns-Manville Sales Corporation, had engaged in unfair competition against appellee "by a course of conduct designed to harass the defendant as a competitor of plaintiff and to intimidate defendant's customers from dealing with the latter and generally to destroy defendant's trade." It perpetually enjoined appellant from intimidating appellee's customers or prospective customers from dealing with appellee with respect to the diatomaceous earth products sold by appellee; and from threatening appellee's customers with litigation because of their use and sale of said products and from suggesting to appellee's customers that they should obtain a guarantee or bond from appellee to cover any loss that might result from suits brought against them by reason of their use or sale of the products. It ordered that appellee "recover from plaintiff all the gains and profits which the plaintiff or its confederates have derived, received or gained or which have arisen or accrued to it or them by the unlawful competition of plaintiff and its confederates against the defendant, and in addition thereto any and all damages which defendant has sustained by reason of said unlawful competition. * * *" The case was referred to a special master to determine such gains, profits, and damages.

Appellant contends that the court erred in finding claims 1, 2, 11, 12, 13, 14, 18, and 21 invalid. It states in its brief that claims 5, 6, and 9, which were held valid, "will not be relied upon before this court." It contends that the court erred in finding that appellant has engaged in unfair competition against the appellee and in ordering an accounting and the issuance of an injunction.

### Validity of Patent No. 1,502,547.

The patent relates to the claimed invention of a diatomaceous earth product and the process of making the same. Claims 1, 2, 11, 12, 13, 14, and 21 are process claims and claim 18 is a product claim. The process involves mixing diatomaceous earth (fossilized remains of diatoms, a unicellular microscopic plant) with a fluxing material such as sodium chloride (common salt) and heating the mixture "sufficiently high to produce incipient fusion, such incipient fusion being defined as a condition at which the particles under the action of heat begin to show a noticeable tendency to adhere, to form weak lumps, or aggregates, or the condition in which there begins to occur such a change that the product after cooling shows a markedly decreased resistance to the flow therethrough of any of the various liquids such as, for instance, a 60 per cent solution of sugar in water." It is also stated

in the patent that "one advantageous effect of the addition of sodium chloride is presumably that it lowers the sintering point of the diatomaceous earth and particularly of the clay content thereof, so as to enable the finer particles of the material (siliceous dust) to be sintered together or to the larger particles, thereby doing away with the excessively fine particles that might tend to clog the filters." Appellant states in its reply brief: "The process involves simply the addition of a small amount of flux to the diatomaceous earth and calcining the mixture in powdered form to an extent sufficient to produce loosely agglomerated lumps (incipient fusion), but not to an extent sufficient to form a hard mass, whereupon the product may be reduced to a powder without shattering the diatom structure."

In the patent two ways are suggested to carry out the process. In one method:

"One hundred pounds diatomaceous earth is mixed with five pounds of sodium chloride (common salt) and the mixture is then ground so as to reduce both the diatomaceous earth and the salt to a state of powder or fine division and to give an intimate mixture. The mixture is then charged into a muffle furnace and heated to about 1800° F., at which temperature it is maintained for one hour. The product is then removed from the furnace, and reground to form of powder, if necessary, although in some cases such regrinding is not required."

In the other method:

"An oil fired rotary kiln 6 ft. in diameter and 100 ft. long was continuously fed with the diatomaceous earth which had been milled, but not completely dried as is customary, so that almost 20 per cent moisture was present. A technical grade of sodium chloride was fed into the feeding mechanism at about 5 per cent on a total weight of diatomaceous earth.

"The temperature of the kiln varied from about 1900° F. in the firing and discharge zone to about 1000° F. at the feed end. The calcined material was cooled and then passed through a fan so as to break up the larger particles formed during burning. Under certain conditions it may be desirable to incorporate salts of alkali forming metals in the form of a solution and then calcining, and we have found that the operation may be quickly and successfully carried out in this manner."

The object of the alleged invention as disclosed by the patent "is to provide by treatment of diatomaceous earth in this manner, a product which is of greater commercial value, more attractive appearance and better adapted for use as a filter aid or for other purpose for which diatomaceous earth is used, for example, as an insulating material, as an ingredient in soaps, paints, dental preparations or other compositions or articles where lightness in weight, softness or fluffiness, fine subdivision and pure white color are essential or desirable." As to the efficiency of the patented product as a filter-aid, the patent states: "The product so obtained has been tested for efficiency as a filter aid or filtration accelerator, in the following manner: Sixty pounds raw cane sugar is dissolved in forty pounds water at 80 degrees C., and to the solution is added 0.8 pounds of the calcined product produced as above described. On pumping through a filter-press with a surface area of .37 square feet, there is obtained in 12 minutes a filtrate weighing 35 pounds as compared with only 6.4 pounds when diatomaceous earth without this treatment is used."

The steps indicated in the claims of the patent are the grinding of the natural earth, the addition of the flux in the form of powder or liquid, the subjecting of the mixture to intense heat for a period to be determined by the effect of the heat upon the mixture, and the regrinding of the calcined product where necessary to break up the conglomerations due to partial fusion.[1]

There is a conflict between the testimony of the experts as to the exact effect of the process upon the diatomaceous

---

[1] Claim 13, which is typical of the process claims is as follows: "The process which consists in intergrinding diatomaceous earth with a salt of an alkali forming metal, and calcining the resulting mixture at a temperature of incipient fusion."

Claim 11 describes the calcination temperature as above the melting point of the salt.

Product claim 18 is as follows: "A finely divided diatomaceous earth product consisting of the product of calcination of diatomaceous earth with a salt of an alkali forming metal, such calcination being effected above the melting point of such salt, and the earth being finely divided after calcination."

earth responsible for the increased flow rate of the calcined product when used as a filter-aid. Appellant's witness, Harry W. Morse, testified that the improved product was produced by the fusion of the finer particles of the earth while the appellee's witness, Clark S. Teitsworth, testified that the increased efficiency of the calcined product was due to the action of the flux in penetrating the air pockets in the interstices of the individual diatoms and the outside of the diatoms, glazing and stiffening the diatoms and making them less compressible. However this may be, we deem it immaterial to the validity of the patent, as it is not essential that an inventor understand the exact nature of the physical or chemical changes involved or resulting from his process, if the product and the process are novel and useful. Andrews v. Cross, C.C., 8 F. 269, 19 Blatchf. 294, 305; Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527; Hemolin Co. v. Harway Dyewood & Extract Mfg. Co., 2 Cir., 138 F. 54; Badische Anilin & Soda Fabrik v. Kalle et al., C.C., 94 F. 163.

The appellant insists that by the patented process it has produced a new product, that is, a diatomaceous earth filteraid product having a new and higher flow rate[2] than that of any diatomaceous earth filteraid powder previously known. Appellant states that "the patented product may have other properties and uses; but the more efficient filteraid was the thing that was new. This is what the patent was intended to protect and should be construed to cover it."

A filteraid powder is used in the removal of impurities from liquids by filtration. The powder is stirred into the liquid to be filtered. The powder attaches itself to the impurities and as the liquid passes through a cloth filter the powder, with the impurities remains on the inner surface of the filter forming a cake increasing in thickness as the liquid escapes through the filter cloth until the rate of filtration becomes too slow, whereupon the caked powder is removed and the process repeated. The filter cake formed is porous and thus aids the cloth filter in the removal of impurities. For this reason the powder has been given the name

"filteraid" as distinguished from a filter proper.

Appellant contends that the flow rate of the patented product is five times that of natural milled diatomaceous earth powder and more than twice that of straight calcined diatomaceous earth powder.

Calcining diatomaceous earth to increase its filtration qualities was not new in the art at the time of the issuance of the patent in suit. A British patent issued in 1898 to Lozé described a process whereby diatomaceous earth was calcined to produce a better filter powder. This patent, it is true, did not contain the step of adding a flux to the earth but it appears from the evidence that all diatomaceous earth contains in its natural state more or less flux. The product thus obtained by the Lozé process would thus be pertinent on the question of anticipation of the product claim in suit. There is also evidence of prior use by the California & Hawaiian Sugar Refining Corporation of a method whereby used diatomaceous earth was "regenerated" by a process consisting of drying the spent filter cake, disintegrating it, and then calcining it to produce a white product of improved flow rate because of the presence of a flux in the used earth. And in a patent application of Percy A. Boeck, which resulted in the issuance of United States patent No. 1,571,042, a process is disclosed whereby the filtration qualities of used diatomaceous earth may be restored by calcination.

The process of calcining diatomaceous earth after first adding a flux is also disclosed by the prior art.

### North Patent.

In a German patent, No. 297,884, issued May 26, 1917, to Dr. Wilhelm North, a process is disclosed whereby kieselguhr (diatomaceous earth) is combined with water glass and the mixture calcined. Water glass is a form of sodium silicate, which is a salt of an alkali forming metal adapted to lower the sintering point of diatomaceous earth and which is now used by appellee in its alleged infringing process. The North process, as described in the patent, is as follows:

[2] Flow rate indicates the speed of filtration and is measured by the amount of liquid that is passed through the filter before the filter cake has ceased to be effective because of the clogging of its pores. As defined in appellant's opening brief it is "a measure of the quantity of liquid which may pass through the filter before the cake must be removed from the filter either because the flow of liquid therethrough has decreased to below an economical limit or requires too high a pressure."

"The process is carried out in the manner that to the Kieselguhr upon coming from the mine, after removing the coarser impurities, there is added a very small percentage of soda water glass (sodium silicate). Only a very small quantity must be used as otherwise the porosity of the Kieselguhr is reduced. The addition of the minimum quantity of sodium silicate is effected in the manner that first of all the commercial solution of about 40° Be is diluted, by adding water, to about 15°, thereupon the Kieselguhr is moistened with this solution and the moistened material is pressed into formed parts so that the solution is uniformly pressed against all particles of the Kieselguhr in this way obtaining a uniform permeation. The calcining of these formed parts can take place immediately at the customary temperature of about 900° [C].

"The Kieselguhr in this connection is calcined to a snowy white color without any sintering and without considerably reducing the desired porosity.

"The calcining to a white color is caused on the one hand by a slight deposit on the individual siliceous shells, while on the other hand it must be assumed that the water glass solution is decomposed by carbon dioxide, silicic acid being separated.

"The final product is a pure white powder which can be used for many purposes."

### Patent Claim.

"Process for the calcining to a white color of Kieselguhr, having the distinctive feature that the Kieselguhr, prior to the calcining, is uniformly impregnated with the smallest possible addition of water glass."

In interpreting the North patent, it appears that in Germany, in some instances, diatomaceous earth is roasted in specially constructed muffle ovens, but, in general, the German process of calcining diatomaceous earth is to burn it in heaps, its admixtures of organic material supplying the fuel; that in order that air for combustion should circulate in such a heap it is necessary that the diatomaceous earth should be in chunks or bricks. Appellant's expert witness Morse testified on this subject as follows: "Taking into account the calcining operation, * * * North means that sodium silicate was to be added to the crude material, and that the crude material was then to be pressed into the form of blocks or bricks and that these bricks were to be sent to the usual calcination heap and calcined in the usual

way at the customary temperature of about 900°. He says that under these conditions the kieselguhr calcines to a white color and that * * * meant that he could use green earth, high in organic matter, which would otherwise calcine to a reddish or buff color, and produce a white product."

It is claimed by appellant that the purpose of the North patent, read in relation to the background of the German art of calcining earth, was to eliminate the organic matter from the earth and to obtain a white product. It should be observed, however, that under the North process diatomaceous earth is not burned so as to sinter the mass and deprive it of its porous quality. At the time of the North patent calcined diatomaceous earth was used in Germany for filtration. It appears that the temperature specified by North (900° C. or 1652°F.) is slightly above the melting point of water glass which is about 1600° F. The evidence shows that if 5 per cent. of sodium silicate is added to 95 per cent. diatomaceous earth in such a manner that small particles of sodium silicate come in contact with small particles of diatomaceous earth incipient fusion will begin at about 1460° or 1470° F. As to whether a product produced by following the process disclosed by the North patent would result in a more efficient filter-aid than unprocessed diatomaceous earth, Morse testified that following the North patent he obtained flow rates between those of appellant's product, uncalcined diatomaceous earth, and its diatomaceous earth product calcined without the added flux. On the other hand, Teitsworth, expert witness for appellee, testified that a product manufactured in accordance with the teachings of the North patent was tested for filtration properties and found to have a flow rate of 178 per cent. of appellee's products which, according to appellant, have a flow rate approximately five times the flow rate of appellee's natural milled diatomaceous earth product, that is to say, a flow rate equal to, or greater than, the product produced by following the patent.

### Passow Patent.

On May 28, 1912, a United States patent was granted Hermann Passow for a method of making filters from diatomaceous earth. In the patent, the process is described as follows: "If an intimate mixture of kieselguhr, clay and the like with a suitable flux such as salt, fluorspar, is burned at a high temperature a fritted, porous substance will be produced which

forms an excellent filtering ·material, remarkable for its great strength and its high filtering speed. * * * If the aforementioned burning operation is however carried out at temperatures which will not suffice to completely fuse the filter components, a bacteria proof filtering material will be produced, as the kieselguhr will remain perfectly sound, and this filtering material thus obtained will be extremely brittle and very sensitive toward outward mechanical and physical influences."

Examination of that patent shows that two steps which constitute the process of that patent are disclosed. In the first step, the composition of kieselguhr, clay, and a suitable flux such as salt are heated to a high temperature so that the mixture is "fritted" together; in the second step, some of the same mixture is burned at a temperature "which will not suffice to completely fuse the filter components" and a layer of soft filtering material is produced.

■ We think that the patent in suit is anticipated by the prior art referred to and particularly by the North, Lozé, and Passow patents.

■ In regard to the product claim in suit (claim 18) we think it clear that there is no invention over the product produced by North and Lozé, although it may be assumed that appellant's product is superior. Such a difference, if it may be attributed to the patented process, is only one of degree and is not patentable. Lovell Mfg. Co. v. Cary, 147 U.S. 623, 13 S.Ct. 472, 37 L.Ed. 307; Greene Process Metal Co. v. Washington Iron Works, 9 Cir., 84 F.2d 892; Elliott Core Drilling Co. v. Smith, 9 Cir., 50 F.2d 813, 816; California Fruit Growers' Exchange et al. v. Blake, Moffitt & Towne, 9 Cir., 19 F.2d 467.

■■ In regard to the process claims in suit (claims 1, 2, 11, 12, 13, 14, and 21) it is clear that the patents to North and Passow in particular anticipate them. The variation between the North process and the process in suit is that in the latter the earth and added flux is burned in powdered form while in the former the mixture is burned in formed parts or bricks. But the essence of the claimed invention lies in the fact that, prior to calcination, the diatomaceous earth is uniformly mixed with a flux. When so mixed and when properly calcined the product produced has a high flow rate when compared with the unprocessed earth, resulting, appellant contends,

from incipient fusion. In the North patent we find a uniform permeation of the flux prior to calcination and the burning process is carried on above the melting point of the flux but not at such a temperature as to deprive the earth of its porous qualities. And, as we have stated, the expert witnesses Morse and Teitsworth both testified that by following the North process a product was produced that could be used as a filteraid and which had an increased flow rate over uncalcined diatomaceous earth, although the product produced by Morse was below that of diatomaceous earth calcined without the addition of a flux. Morse attributed the relatively slow flow rate of the North product produced by him "to the fact that in such operation, resulting in the calcining of a brick or block, which is afterwards broken down by milling, there is destruction of some of the diatom shapes to such an extent that filtration properties, which are those of a large proportion of unbroken diatoms, are destroyed." In both the North patent and the patent in suit the final product is a powder although the method of reduction of the burned material to a powder is not described in the North patent. In appellant's patent it is shown that the reduction of the calcined material to powder may be accomplished either by a fan or by grinding. This knowledge was old in the art. In the use of a fan, the structure of the diatom is preserved to a greater extent than if the calcined material was otherwise ground. The test of the identity of processes is not the apparatus used for carrying them out but whether they involve identical or equivalent steps. See Philadelphia Rubber Works Co. v. Portage Rubber Co., 6 Cir., 241 F. 108. In answer to appellant's contention that the purpose of the North process was simply to remove organic matter and bleach the product, it is sufficient to state that, as the patented process in suit was disclosed by the North patent, it was anticipated by that process even though it be assumed that the North patent failed to state, and that North did not know, of the increased flow rate of the product produced. Walker on Patents, 6th Ed., p. 291, § 218; Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L. Ed. 527; Kennicott Co. v. Holt Ice, etc., Co., 7 Cir., 230 F. 157, 160; Lovell Mfg. Co. v. Cary, 147 U.S. 623, 13 S.Ct. 472, 37 L.Ed. 307.

■ In regard to the Passow patent it should be noted that in the process there

disclosed the diatomaceous earth is combined in "an intimate mixture of a flux and clay" and calcined to produce a superior filtering material and that the increased filtering qualities of the product is claimed to be due to the sintering of the materials. Appellant contends that the Passow patent is directed to the making of rigid filtering plates while the patent in suit concerns the process of producing a filteraid, a powder, and that the fusion of the material in the Passow patent is more complete than in the patent in suit. It is contended that, because of such fusion, the mixture after calcination could not be milled without injury to the diatom structure. There is evidence, however, that a powder made of the soft material manufactured in accordance with the process of the Passow patent has a flow rate of about three and one-half times that of the uncalcined powder. The fact that Passow may have taught fusion of the materials to a greater degree than the disclosures in the patent in suit does not show lack of anticipation. See, Greene Process Metal Co. v. Washington Iron Works, 84 F.2d 892, supra; Elliott Core Drilling Co. v. Smith, 50 F.2d 813, 816, supra; California Fruit Growers' Exch. et. al. v. Blake, Moffitt & Towne, 19 F.2d 467, supra. The patent in suit merely applies the old process of the Passow patent for producing filter plate to the analogous art of producing filteraid and, therefore, does not disclose invention. Lovell Mfg. Co. v. Cary, 147 U.S. 623, 13 S.Ct. 472, 37 L.Ed. 307.

We have not overlooked appellant's argument in regard to the weight to be given the commercial success of a patented invention in determining the validity of the patent. This cannot overcome clear lack of novelty and invention. Thropp's Sons Co. v. Seiberling, 264 U.S. 320, 330, 44 S.Ct. 346, 350, 68 L.Ed. 708; Duer v. Corbin Cabinet Lock Co., 149 U.S. 216, 224, 13 S.Ct. 850, 37 L.Ed. 707; Lovell Mfg. Co. v. Cary, 147 U.S. 623, 635, 13 S.Ct. 472, 37 L.Ed. 307, supra.

We conclude that the trial court's finding of lack of invention over the prior art in claims 1, 2, 11, 12, 13, 14, 18, and 21 of the patent in suit is correct and that such claims are therefore invalid.

## Counterclaim of Alleged Unfair Competition.

The right to file a counterclaim in this case arises under Equity Rule 30, par. 2, 28 U.S.C.A. following section 723, and constitutes a cause of action which might be the subject of an independent suit in equity. See Cooling Tower Co. v. C. F. Braun & Co., 9 Cir., 1 F.2d 178; Texas Co. v. Borne Scrymser Co., 4 Cir., 68 F.2d 104. In such a case, jurisdiction must be supported upon diversity of citizenship and an amount in controversy exceeding $3,000, exclusive of interest and costs. Although these jurisdictional facts were alleged, there is no finding that the value of the matter in controversy exceeded that amount. In the absence of both a finding of jurisdictional facts and of evidence to support such a finding, a judgment will be reversed and ordered dismissed. Electro Therapy Products Corporation v. Strong, 9 Cir., 84 F.2d 766; McNutt v. General Motors Acceptance Corp., 298 U. S. 178, 56 S.Ct. 780, 80 L.Ed. 1135. If there is no evidence to support a finding of jurisdictional facts the case must be dismissed. KVOS, Inc., v. Associated Press, 299 U.S. 269, 277, 57 S.Ct. 197, 200, 81 L.Ed. 183. In the case at bar, however, there is evidence to support a finding that the amount involved exceeded $3,000, exclusive of interest and costs. The right appellee sought to have protected was the right to conduct its business free from unlawful interference by appellant. See KVOS, Inc., v. Associated Press, supra. The record shows that the investment in appellee's plant alone exceeded $250,000. There was a showing of loss of customers claimed to be due to the alleged unlawful practices whose purchases were substantial, far exceeding the jurisdictional amount. Appellant contends that the jurisdiction is not to be tested by the value of the business involved, citing McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135, supra; see, also, KVOS, Inc., v. Associated Press, 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183, supra. In the case of McNutt v. General Motors Acceptance Corp., supra, which involved a suit to enjoin as unconstitutional a state statute requiring plaintiff to obtain a license for its business and subjecting the business to regulation, it was held that inasmuch as the statute did not attempt to prevent the plaintiff from conducting its business and there was no showing that it could not obtain a license for its business and proceed with its operation, the value of the right to be free from regulation was the test of jurisdictional amount, not the value of the business. In the case at bar, the effect of the acts of appellant, done and threatened, which are claimed to constitute unfair trade practice. would be to destroy

appellee's entire business and good will, and the amount of such damage is a proper test of jurisdiction. KVOS, Inc., v. Associated Press, supra. The evidence was sufficient to show that the threatened damage to appellant's business satisfied the jurisdictional requirement as to amount involved.

The evidence of the claimed unfair competition, in substance, amounts to a showing that appellant sent letters (in the years 1931 and 1932), after this suit was begun, to appellee's customers calling attention to the fact that appellant had brought suit against the Pacatome Company[3] for infringement of its patents Nos. 1,632,458 and 1,477,493, which are claimed to cover appellant's straight milled diatomaceous earth, and its diatomaceous earth calcined without the added flux and the method of producing, and also calling attention to the filing of the suit at bar. Other evidence related to letters of appellant to its sales representatives instructing them to advise the customers of appellee to obtain a guarantee or bond from appellee to cover loss due to infringement suits that might be instituted against them. It also appears from the record that representatives of appellant made similar statements and that appellee's customers were also told that, financially, appellee could not weather the storm of pending suits. These statements were made in the years 1931 and 1932. The letters were sent and the representations were made to customers of appellee who used its diatomaceous earth filteraid products prepared without the use of a flux, and, consequently, not covered by the patent in suit.

■ Bad faith is an essential element in the charge of unfair competition where such charge is based upon claims of patent infringement and threats to take action based upon such infringement. Emack v. Kane, C.C., 34 F. 46; Alliance Securities Co. v. De Vilbiss Mfg. Co., 6 Cir., 41 F.2d 668; Oil Conserv. Eng. Co. v. Brooks Eng. Co., 6 Cir., 52 F.2d 783, 785; American Ball Co. v. Federal Cartridge Corp., 8 Cir., 70 F.2d .579, 98 A.L.R. 665; Art Metal Works v. Abraham & Straus, 2 Cir., 70 F.2d 641.

■ There is nothing wrong in notifying infringers that they are guilty of infringement and are liable therefor. Indeed, such notice is required in some fashion before suit for infringement can be maintained. 35 U.S.C.A. § 49; American Ball Co. v.

Federal Cartridge Corp., supra, 70 F.2d 579, at page 581, 98 A.L.R. 665.

Where a holder of a patent attempts to destroy a competitor by threats to bring infringement suits against its customers and such threats are made without the intention of bringing such suits, and where there is an opportunity to bring such suits without any attempt to evade the issue on the part of the alleged competitor, it has been held that a long delay in bringing the suit is such evidence of bad faith in the campaign of intimidation as justifies a finding of malice and an award of damages for past misconduct and an injunction as to future threats and intimidation. Art Metal Works v. Abraham & Straus, supra.

■ In the case at bar the appellant confines its suit for infringement to one of the three patents owned by it which cover its diatomaceous earth products. So far as the claims of unfair competition are predicated upon the letters giving notice of the filing of the suit at bar and upon the efforts of the appellant to retain its monopoly of the sale of diatomaceous earth products presumably covered by the patent in suit (filteraid powder of diatomaceous earth calcined with added flux), we think that there was no evidence of bad faith for the infringement suit at bar was brought before the notices were given. But in regard to the conduct of appellant toward customers of appellee who purchased diatomaceous earth products not covered by the patent in suit (filteraid powders of natural milled diatomaceous earth and diatomaceous earth calcined without the added flux), a different situation is presented. Appellee has had no opportunity to challenge the claims of the appellant and show that its natural and calcined diatomaceous earth products do not infringe the appellant's patents, or that such patents are invalid. Appellant made no attempt to litigate the validity of those two patents (Nos. 1,632,458, 1,477,394) or its claim of infringement in the pending suit as it might have done by answer to the counterclaim. See Federal Elec. Co. v. Flexlume Corp., D. C., 9 F.2d 647.

■ We have thus a situation where the appellant was litigating the validity of one patent, declining to give the appellee an opportunity to litigate two closely related patents, while at the same time attempting to destroy the appellee's business in prod-

---

[3] Appellee states in its brief that the Pacatome suit was filed May 22, 1930.

ucts covered by the other two patents as well as in the product and process involved in the suit at bar. We take judicial notice of the fact that at the time this patent suit was pending it took about two years to get such an action to trial in the United States District Court for the Southern District of California by reason of the crowded condition of the calendar. In the case at bar the action was brought March 17, 1931, by the filing of the bill of complaint and was brought to trial in April, 1933. The trial was concluded in May, 1933, but the case was not decided until May, 1935, when the trial judge handed down his memorandum opinion which was followed by findings of fact and conclusions of law, and decree issued October 31, 1935. Appellant states in its brief that suit has been brought by it against the Pacatome Company (the suit referred to in the form letter sent the trade by appellant through Johns Manville Company) on the patents owned by it which are claimed to cover appellee's natural milled diatomaceous earth and straight calcined diatomaceous earth products. Appellant contends that pending the determination of the Pacatome case it has withheld filing of a corresponding suit against appellee to avoid a needless multiplicity of litigation and that this is entirely proper. The cases cited by appellant on this point (McWilliams Mfg. Co. v. Blundell, C.C., 11 F. 419, 422; Timolat et al. v. Franklin Boiler Works Co., 2 Cir., 122 F. 69) are concerned with the question of laches and are not pertinent in the case at bar. It is true that appellant need not sue all alleged infringers at one time. But where, as here, a campaign is conducted which is designed to destroy a competitor's business and where ample opportunity is presented to litigate the patents involved, which is not availed of, the inference of bad faith is inescapable. Appellee has no opportunity to defend the Pacatome suit, would not be bound by a judgment there rendered, and the question of infringement of the patents involved therein has no bearing on the question of infringement of the same patents by appellee.

We conclude that the evidence sustains the charge of malice in regard to appellant's conduct regarding customers of appellee not using diatomaceous earth products covered by the patent in suit, that an accounting was properly ordered therefor, and that an injunction should be issued against such conduct until such time as the appellant brings suit for infringement of the two patents against the appellee. In regard to the conduct of appellant toward customers of appellee who were using products presumably covered by the patent in suit we hold that there was no malice and that there should be no accounting therefor.

The decree of the District Court holding claims 1, 2, 11, 12, 13, 14, 18, and 21 of the patent in suit invalid, and 5, 6, and 9 valid and not infringed, is affirmed. That part of the decree ordering an injunction and accounting against appellant is directed to be modified to cover appellee's two other filteraid products only, in accordance with this opinion.