NOVOCOL CHEMICAL MFG. CO., Inc., v.
POWERS & ANDERSON DENTAL
CO., Inc.

No. 4848.

Circuit Court of Appeals, Fourth Circuit.

June 15, 1942.

S. Mortimer Ward, Jr., and James B. L. Orme, both of New York City (Paul B. Eaton, of Washington, D. C., on the brief), for appellant.

Charles J. Merriam, of Chicago, Ill. (Russell Wiles, of Chicago, Ill., on the brief), for appellee.

Before PARKER and SOPER, Circuit Judges, and PAUL, District Judge.

PAUL, District Judge.

In this suit for infringement of a patent the appellant, plaintiff in the District Court, appeals from a decree holding the patent void and denying relief. The parties will be referred to herein as plaintiff and defendant.

The plaintiff is a New York manufacturer of dental anesthetics and the holder of the patent in suit under assignment from Samuel D. Goldberg, a chemist in its employ. The patent, No. 2,051,349, is designated as a "Device for Preserving Local Anesthetic Solutions". The defendant is a dealer in dental supplies and is charged with selling and distributing a device which infringes plaintiff's patent. The alleged infringing device sold by defendant is manufactured by Jacob W. Frankel, doing business as the Minimax Company, and the suit is defended by this latter concern.

The application on which the patent in suit was issued describes it as a "device for preserving local anesthetics which have a tendency to decompose, and more particularly local anesthetics which are used for hypodermic injection". As will hereinafter appear, it relates to a method or manner of packaging the anesthetic to exclude air therefrom during the time between its manufacture and its ultimate use by a dentist or other user. At the present time and for some years it has been a common practice by manufacturers to prepare dental anesthetics for use by enclosing in a small glass tube or cartridge a proper amount of the anesthetic for one injection, these cartridges being of such size and shape as that they can be inserted in a hypodermic syringe. A brief history of the steps which led to the now usual practice of administering the anesthetic in this way is helpful to an understanding of plaintiff's claims.

The essential constituents of the ordinary dental anesthetic in use are procaine (commonly called novocaine) and epinephrin (also known as adrenalin) each performing a proper function in the desired result. The anesthetic solution when freshly prepared is completely colorless, but an epinephrin solution is quickly affected by contact with air and as this oxidation progresses it is evidenced by noticeable color changes. The solution first becomes a light brown, then pink, then tan and finally dark

brown or chocolate colored. This sensitivity to air as well as the characteristic color changes occasioned by it have been generally known among chemists for at least twenty-five years or more.

In an earlier day of the profession it was the custom of each dentist to prepare his own anesthetic solution from tablets, either for use on individual patients or by preparing a bottle of the solution which could be used from time to time. While the dentist could thus be sure of a fresh solution, this manner of preparation had certain disadvantages, including the difficulties of keeping the solution sterile and of insuring uniformity of strength. A development was the practice of manufacturers of mixing the solution in proper proportions in their laboratories and marketing it in individual doses contained in an ampoule consisting of a glass tube, the end of which was drawn together and sealed after the tube had been filled. This protected the epinephrin from oxidation and the anesthetic prepared in this manner showed no discoloration. In use, however, the end of the ampoule had to be broken off and the contents withdrawn into the syringe. The disadvantages of this were possible dangers from splinters of glass when the end of the ampoule was broken and the possibility of infection from the instrument or hand used in breaking it.

Finally about 1922 there was developed by Cook Laboratories the plunger type cartridge which is now in common use. This consists of a glass tube about the diameter of a lead pencil and approximately 3 inches long. The tube is filled with a single dose or injection of the prepared anesthetic solution and each end of the tube is closed with a rubber stopper or plug. While these stoppers are fitted tightly enough inside the tube to prevent leakage of the solution, they (or at least one of them) can be moved inside the tube by pressure. In using these tubes or cartridges the dentist simply removes one from a package containing a number of them and inserts it in his hypodermic syringe. The pointed upper end of the hypodermic needle punctures the rubber stopper in that end of the cartridge while the pressure upon the plunger or rod of the syringe pushes the stopper at the other end through the tube forcing the solution through the needle. This convenient and sanitary method of preparing and administering dental anesthetics has been in common use for many years and these cartridges are made and sold by a hundred or more manufacturers in the United States. It is admitted that there is no patent on this cartridge. It was the custom, in marketing the cartridges, to pack them in pasteboard boxes or cartons each containing about 100 cartridges. The plaintiff began manufacturing these cartridges in 1924, and in common with other manufacturers packed them for shipment in the pasteboard boxes up until 1935. The great majority of manufacturers still pack them in this way.

During the time this cartridge has been used it has been found that in some of the cartridges the contents would become discolored between the time of manufacture and the time of use. This discoloration showed the successive changes to light brown, tan, pink and dark brown heretofore mentioned. It appears that in the preparation of the anesthetic it has been the practice of manufacturers, including the plaintiff, to introduce a certain amount of sodium bi-sulphite for the purpose of retarding the oxidation of the epinephrin. It is testified that the oxygen in the air will be absorbed by the bi-sulphite before affecting the epinephrin and that the latter would not oxidize until the bi-sulphite was dissipated; that so long as any substantial amount of the bi-sulphite remained the epinephrin would not discolor. And it further appears that the sole function of the sodium bi-sulphite in the solution is to retard oxidation of the epinephrin. However the bi-sulphite merely retards oxidation and if any considerable time elapsed between the manufacture of the solution and its use a certain percentage of the cartridges developed discoloration by the time they reached the dentist's hands. It became the custom in the trade that these discolored cartridges could be returned and exchanged without cost. The evidence as to the percentage of losses in this respect is far from definite and consists in the main of the experience of the plaintiff. It is claimed by the plaintiff that in the regular course of its business the returns of discolored cartridges was from 5 per cent to 10 per cent. Losses on foreign shipments were generally larger because of the longer time elapsing between manufacture and use.

In the years 1932-1933, the plaintiff made some large shipments of these cartridges to England, of which about 70 per

cent were returned, resulting in a substantial financial loss. Because of this experience, the plaintiff determined to take steps to remedy the situation and this led to the alleged invention. Dr. Goldberg, who is Director of Research for the plaintiff, states that he conducted a series of experiments to determine the cause of the discoloration. A reading of his testimony indicates that the experiments were limited to ascertaining whether air was leaking into the cartridges. He states that by experiments made in previous years he had determined that the discoloration of the fluid was not due to the rubber stoppers nor to the alkalinity of the glass tube. He says: "Since I had no success with the experiments I had tried up to that time, I determined to see if air was getting into the solution, which, up to that time no one had thought of since the tube was sealed against air".

As a result of his experiments Goldberg satisfied himself that air was getting into the tube and was causing the discoloration of the anesthetic. The plaintiff thereupon decided to use an air-tight container instead of an ordinary paste-board box, in which to package its cartridges, and adopted for this purpose a tin can capable of holding twenty-five cartridges which is sealed under vacuum and in which the cartridges reach the hands of the user. It is important to note that the tin can used is not patented by the plaintiff. In fact, the cans are bought in quantity from one of the large manufacturers of tin containers and are of a common type purchaseable and useable by anyone who desires to package his product in an air-tight container. So far as appears they are bought out of stock and not specially made for plaintiff. The plaintiff began to market its cartridges in the air-tight can in 1935 and less than a year later the Minimax Company began using the same principle. The container used by Minimax and which has provoked this suit is of bakelite and is referred to as being hermetically sealed and containing, besides the cartridges, an oxygen-absorbent element. Any distinction between the two devices does not, however, need discussion.

The patent of the plaintiff is upon the combination of the cartridges and the air-tight can in which they are packaged; or as the plaintiff expresses it; "The invention is for a combination of two seals for the solution, one a complete outer seal providing a vacuum around several cartridges, thus allowing the solution to be stored for a long time, * * * and the other—the individual cartridge seal being a tight but imperfect air seal sufficient to prevent discoloration of the solution for the several weeks or months that a dentist would ordinarily keep these tubes after breaking the outer seal."

Simply expressed, the question is whether the plaintiff, after satisfying itself that the cartridges permitted the leakage of air, is entitled to a patent on the idea of packing them in air-tight cans. Faced with the fact that both the cartridges and the tin cans were old elements in common use and that an obvious method of excluding anything from contact with air is to put it in an air-tight container, the plaintiff seeks to emphasize that it was the inventive genius of Dr. Goldberg in discovering that leakage of air was causing the discoloration that inspired the combination. When one considers the state of the art in the form of the knowledge possessed and the practices used by those engaged in it at the time of Dr. Goldberg's experiments, some question might arise as to the necessity for any experiments. At that time it was commonly known to chemists, including Dr. Goldberg, and had been for twenty years that epinephrin was sensitive to oxidation and that contact with the air produced a series of characteristic color changes. It was known that when the anesthetic solution had been prepared in glass ampoules, sealed at both ends and air-tight, no discoloration occurred. When the cartridges came into use all manufacturers, including the plaintiff, used sodium bi-sulphite in the solution for the sole purpose of retarding oxidation of the epinephrin, thereby indicating their expectation that air would leak into the cartridge. Some manufacturers went further and covered the ends of the cartridge with paraffin, a further recognition that the cartridge was not air-tight. Dr. Goldberg knew all of these facts and had already satisfied himself that the discoloration was not due to the rubber or the glass. When then the solution continued to show the discoloration characteristic of oxidation, it does not seem that any great originality of thought was necessary to reach the conclusion that some air was reaching the solution. But even if, as Dr. Goldberg states, "it was not known conclusively at that time what was causing the discolora-

tion", and he experimented for the purpose of resolving this uncertainty, the most that can be said is that he proved to his satisfaction a physical fact the ·existence of which was strongly indicated and which he himself surmised, as shown by the nature of his experiments.

There was no invention in conducting routine tests to prove or disprove the existence of a physical fact. Patents may be issued for arts, machines, manufactures and compositions of matter, 35 U.S.C.A. § 31. But the laws of nature and their workings are not the subject of invention by man. He may discover them and bring them to the knowledge of the world but he cannot patent that discovery; he can obtain a patent only when he has invented an art or a machine whereby to utilize his discovery. O'Reilly v. Morse (involving invention of the telegraph) 15 How. 62, 112, 14 L.Ed. 601; Walker on Patents, 6th Ed., Sect. 18.

Therefore, when we come to consider the only thing which could have been the subject of invention, namely, a device for overcoming the effect of the physical fact which his tests proved, we find no element of originality or invention. The remedy was obvious and one of long practice, consisting merely in putting the product in an air-tight container for the purpose of preventing contact with the air.

 We are in complete agreement with the District Court that this was merely an aggregation of old elements accomplishing no new result and that the patent is invalid. The cartridge and the tin can were both old and it is not only obvious, but of long practice, to use air-tight containers to exclude air from their contents. Aggregation is not invention. This well established principle was reiterated by this court in the recent case of Connecticut Paper Products v. New York Paper Co., 4 Cir., 127 F.2d 423, 427, decided April 13, 1942, where, quoting from Hailes v. Van Wormer, 20 Wall. 353, 368, 22 L.Ed. 241, it is said: "It must be conceded that a new combination, if it produces new and useful results, is patentable, though all the constituents of the combination were well known and in common use before the combination was made. But the results must be a product of the combination, and not a mere aggregate of several results each the complete product of one of the combined elements. Combined results are not necessarily a novel result, nor are they an old

result obtained in a new and improved manner. Merely bringing old devices into juxtaposition, and there allowing each to work out its own effect without the production of something novel, is not invention. No one by bringing together several old devices without producing a new and useful result the joint product of the elements of the combination and something more than an aggregate of old results, can acquire a right to prevent others from using the same devices, either singly or in other combinations, or, even if a new and useful result is obtained, can prevent others from using some of the devices, omitting others, in combination."

See also Reckendorfer v. Faber, 92 U.S. 347, 357, 23 L.Ed. 719, where it is said: "The combination, to be patentable, must produce a different force or effect, or result in the combined forces or processes, from that given by their separate parts. There must be a new result produced by their union; if not so, it is only an aggregation of separate elements."

And see Pickering v. McCullough, 104 U.S. 310, 26 L.Ed. 749; Adams v. Bellaire Stamping Co., 141 U.S. 539, 12 S.Ct. 66, 35 L.Ed. 849; Powers-Kennedy Corp. v. Concrete Co., 282 U.S. 175, 186, 51 S.Ct. 95, 75 L.Ed. 278; Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 486, 55 S.Ct. 455, 79 L.Ed. 1005; Grinnell Washing Machine Co. v. E. E. Johnson Co., 247 U.S. 426, 433, 38 S.Ct. 547, 62 L.Ed. 1196; Office Specialty Mfg. Co. v. Fenton Metallic Co., 174 U.S. 492, 498, 19 S.Ct. 641, 43 L.Ed. 1058; Richards v. Chase Elevator Co., 158 U.S. 299, 15 S.Ct. 831, 39 L.Ed. 991.

 In combining the use of two known and long utilized elements, the plaintiff accomplished no new result. The exclusion of air from various products or articles by packing them in air-tight containers is a result which has been applied to a countless variety of things. Every housewife who puts up her annual quota of fruit and vegetables in the well-known rubber-sealed fruit jar is accomplishing this result. And the same result has been effected by commercial packers who for years have been using air-tight containers on everything from sausages to coffee. All the plaintiff has done is to apply an old result to an article to which it had not previously been applied. It is not invention to use an old process for a new or analogous purpose. See Walker on Patents (6th Ed.) Sect. 76,

and cases there cited, including King v. Gallun, 109 U.S. 99, 3 S.Ct. 85, 27 L.Ed. 870; Miller v. Foree, 116 U.S. 22, 27, 6 S. Ct. 204, 29 L.Ed. 552; Dreyfus v. Searle, 124 U.S. 60, 63, 8 S.Ct. 390, 31 L.Ed. 352; Brown v. Piper, 91 U.S. 37, 23 L.Ed. 200; Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 491, 20 S.Ct. 708, 44 L.Ed. 856.

In the instant case the patentee is in the situation described in Crescent Brewing Co. v. Gottfried, 128 U.S. 158, 169, 9 S. Ct. 83, 87, 32 L.Ed. 390, where it was said: "The patentees have, at most, merely applied an old apparatus to a new use, without any change of its constituent elements or of its mode of operation". His invention is on a parity with that involved in Dreyfus v. Searle, supra [124 U.S. 60, 8 S.Ct. 392, 31 L.Ed. 352] of which the Court said, "There was no patentable invention in applying to the heating of wine or any other liquor, from the inside of the cask, the apparatus which had been previously *used to heat another liquid in the same manner*". (Italics supplied).

To support its contention of invention and patentability, the plaintiff argues that manufacturers suffered loss from discolored cartridges for many years without finding a remedy, and that this is evidence that the solution of the problem was not obvious to those skilled in the art but the result of the inventive faculty. It argues also that there has been general recognition of the patent in the trade, in that only two or three manufacturers have infringed. It is true that in some cases the failure to solve a long existing problem may be taken as indication that its solution involved invention even though that solution when accomplished seemed simple and obvious. On the other hand it is equally true that delay in finding a remedy may be evidence that the so-called problem was not considered to be one worth solving. The evidence here suggests the probability of one answer to both of plaintiff's arguments, namely, that the cost of these cartridges is so small that the loss of a small percentage of them through discoloration is outweighed by the expense of the material and labor necessary to the use of the air-tight can. But whether the problem was worth solving or not, or whether plaintiff's method is worth imitating or not, the patent discloses merely the application of old and established practices to an article to which they had not previously been applied.

If the contention of the plaintiff were upheld, there could be a separate patent covering each case in which some article for the first time was packed in an airtight can. The canning of each separate vegetable or fruit might have been the subject of a separate patent although each were canned for the same purpose and by identical methods. In fact the particular method of packing would be of no moment for the plaintiff, discarding any claim to invention of the cartridge or of the airtight can, argues that its patent would be infringed by anyone who might choose to pack these cartridges in a fruit jar or to ship the solution in bulk in an air-tight steel drum, or to use any method adopted for the purpose of excluding air from the package.

This means, of course, that the claimed invention lies solely in the idea of applying the methods adopted to a particular article as distinguished from any other article; even though the methods adopted and the results accomplished were old and well known. A patent which rests on no stronger foundation than this is clearly invalid. The decree of the District Court is affirmed.

Affirmed.