**NATIONAL LEAD COMPANY,**
Appellant,

v.

**WESTERN LEAD PRODUCTS COM-
PANY,** Appellee.

**No. 18016.**

United States Court of Appeals
Ninth Circuit.

Nov. 13, 1963.

Rehearing Denied Dec. 24, 1963.

Fish, Richardson & Neave, W. Philip Churchill and Harry R. Pugh, Jr., New

---

York City, Lyon & Lyon, Los Angeles, Cal., for appellant.

Harris, Kiech, Russell & Kern, and Ford Harris, Jr., Los Angeles, Cal., for appellee.

Before JERTBERG and KOELSCH, Circuit Judges, and BOWEN, District Judge.

JERTBERG, Circuit Judge.

Since cross-appeals are involved, we will in this opinion refer to parties by the designation in the District Court.

The plaintiff, National Lead Company, owner of the Mayer Patent No. 2,235,487 instituted this action against defendant, Western Lead Products Company for infringement of its patent and seeking damages [to be trebled because of the alleged wilful character of the infringement] as well as injunctive relief. Defendant filed its answer denying infringement, and alleging the Mayer patent to be invalid for lack of invention and on other grounds, and alleging that any recovery by plaintiff was barred by laches.

Following the trial, the District Court found that claims 1 and 2 of the Mayer patent were lacking in invention, that claim 2 if valid had been infringed by the defendant, and that plaintiff was not guilty of laches. Judgment was entered accordingly. Plaintiff appealed from the judgment of the District Court dismissing its complaint, and the defendant cross-appealed from that part of the judgment holding that claim 2 of the Mayer patent had been infringed, and holding that plaintiff was not guilty of laches.

We remanded the cause to the District Court for the making of appropriate findings of fact, conclusions of law, and the entry of judgment based thereon. See National Lead Company v. Western Lead Products Company, 291 F.2d 447 (9th Cir. 1961).

Upon remand no new evidence was presented to the District Court. After a hearing and after reconsidering the evidence, the District Court entered thirty-six exhaustive findings of fact and eight conclusions of law. The Court reached therein the same conclusions as before upon the issues of validity, infringement, laches, and further concluded that claim 2 of the patent was fatally defective for overclaiming and indefiniteness.

For a description of the patent in suit reference is made to our earlier decision, 291 F.2d at 449. In support of its defense of invalidity of the Mayer patent for lack of invention, defendant relies upon the same matters as before which are summarized 291 F.2d at 450.

The alleged invention of the Mayer patent resides in adding to the conventional Barton pot process the controls set forth in claim 2, which reads as follows:

"2. Process for continuously producing a mixture composed of fine lead particles, tetragonal PbO crystals and orthorhombic PbO crystals, such mixture having a predetermined color determined by the relative proportions of the aforesaid components, which consists in passing a stream of air into contact with a bath of molten lead and molten lead particles above said bath, while the bath is being agitated in such manner as to throw off said molten lead particles therefrom and, while said agitation is continued and the rate of flow of said stream of air is such as to carry away fine particles of said mixture formed by reaction of said air with said bath and molten lead particles, feeding molten lead to said bath at a variable rate of feed, maintaining the temperature of the bath within a maximum variation of 100°F. by increasing the said rate of feed when the reaction temperature shows signs of falling and diminishing said rate of feed when the reaction temperature shows signs of rising and continuing such variation of the feeding rate for the duration of the process in such manner as to yield a product mixture of substantially non-varying color effect, and composition characteristics."

Plaintiff emphasizes that the process described in the Mayer patent exhibits inventiveness in the following respects:

(1) that although it was known that the product of the conventional Barton pot process consisted of lead oxide (PbO) and finely divided lead particles, Mayer first recognized that two crystalline forms (orthorhombic and tetragonal) of the lead oxide component appear in the product;

(2) that Mayer discovered that the temperature of the reaction in the pot has a direct effect upon the amounts and relative proportions of orthorhombic and tetragonal PbO occurring in the product;

(3) that Mayer discovered that the temperature of the reaction in the Barton pot has a direct effect upon the size of the particles in the product and upon the percentage of unoxidized metallic lead contained in the product;

(4) that Mayer discovered that by controlling the total range of temperature of the reaction in the pot within a maximum of 100°F., but preferably less, the Barton pot process would produce a uniform product of predetermined composition;

(5) that Mayer first taught that control of the temperature of the reaction in the pot within the prescribed range, with the aforesaid desirable results, could be achieved by a process of feeding a continuous, but varying, stream of molten lead from a separate melting pot into the Barton pot, increasing the rate of feed when the temperature decreased and decreasing the rate of feed when the temperature increased; and

(6) that a continuous, but varying, feed of a stream of molten lead from the melting pot into the Barton pot could be achieved by means of a valve and regulation thereof by hand operation.[1]

Plaintiff consistently attacks the District Court's findings of fact on the ground that the evidence does not support the inference that the prior art was aware of the relationship between the temperature of the reaction and the uniformity of composition and size of the Barton pot product. Assuming, but without deciding, that Mayer was the first to make the discoveries enumerated 1 through 4 above, those discoveries, without more, are unpatentable. Davison Chemical Corp. v. Joliet Chemicals, 179 F.2d 793 (7th Cir. 1950), C.D., 340 U.S. 816, 71 S.Ct. 45, 95 L.Ed. 599 (1950). The Davison Chemical case is strikingly similar to the instant case in that the patentee had discovered for the first time that a definite relationship exists between the temperature of the wash water and the porosity of the final product in the process for making silica gel. The process and the washing were both old; the suggestion that the higher the temperature of the wash water, the lower the density of the product was new. The court said, 179 F.2d 794–795:

"It is one thing of course to discover a scientific fact, a law existing in nature, and quite another to invent a means of making that discovery useful. * * * Consequently the question becomes one of whether, when [patentee] discovered the scientific fact that temperature of the washing water directly affects the density of the washed product, he then devised a process for utilization of that scientific fact which amounted to invention. * * *

"While a scientific truth, or its mathematical expression is not patentable invention, a novel and useful structure created with the aid of knowledge of scientific truth may be. Mackay Radio & Telegraph Co. v. Radio Corp., 306 U.S. 86 at page 94, 59 S.Ct. 427, 83 L.Ed. 506. He who discovers a hitherto unknown scientific fact or law of nature has no claim to a monopoly of it; if there is to be invention from such a discovery it must come from the application of the law of nature or scientific fact to a new and useful end.

---

1. It is conceded that the use of a conventional valve to regulate the flow of molten lead does not furnish inventiveness if the patent lacks invention otherwise. In any event, the use of such a valve is taught by the Wilhelm patent, 1,617,887.

Funk Brothers Seed Company v. Kalo Inoculant Company, 333 U.S. 127, 68 S.Ct. 440, 92 L.Ed. 588. See also DeForest Radio Company v. General Electric Company, 283 U.S. 664, 685, 51 S.Ct. 563, 75 L.Ed. 1339; Wall v. Leck, 9 Cir., 66 F. 552, 555; In re Modine, 57 F.2d 355, 356, 19 C.C.Pa., Patents, 1058. Discovery of a previously unknown law of operation, involved in no new method, has never been held to be invention. The application of the law must be novel and inventive in character. Luten v. Whittier, 6 Cir., 251 F. 590; General Electric Co. v. Cooper Hewitt Electric, 6 Cir., 249 F. 69.

"Keeping these principles in mind and applying them to the present case, we assume that [patentee] discovered that the temperature of the wash water determined the pore size and, therefore, the specific gravity or density of the gel but, we think, that, once having discovered this, it required nothing more than the ordinary skill of the scientist to determine that maintaining the temperature of the water at a constant point would make the size of the pore, and the density of the silica gel, uniform."

█ In the instant case it is conceded that the product of the Mayer process was not new and unique, i. e., a mixture of tetragonal and orthorhombic PbO and particles of unoxidized metallic lead. If, as plaintiff asserts, the Mayer patent first disclosed the approximate temperatures at which Barton pot products may be produced having certain specified characteristics of composition and size, such would not be patentable. Quoting again from the Davison case, 179 F.2d 795:

" 'To find the [temperature] range, required nothing more than routine experimentation by a skilled chemist, and that being so, invention was not involved.' American Lecithin Co. v. Warfield Co., 7 Cir., 128 F.2d 522,

526. See also Novocol Chemical Mfg. Co., Inc., v. Powers & Anderson Dental Co., Inc., 4 Cir., 128 F.2d 904."

Our inquiry must therefore focus upon whether an artisan, knowing that the temperature of the reaction determines the uniformity of the product, would require more than ordinary skill to discover the process of controlling the reaction temperature by varying the feed of molten lead into the Barton pot.

The District Court found that given the prior art teachings of the Ishimura, Braselton and Wilhelm patents,[2] the prior knowledge and use by Metals Refining Co., the alleged invention of the Mayer process would have been obvious to a man of ordinary skill in the Barton pot operation and, if it involved anything, it involved nothing more than ordinary skill in the art. As pointed out in footnote 1 above, the Wilhelm patent teaches the use of a valve to regulate the feed of molten lead into a lead oxidizing apparatus. The Braselton patent does not relate to the Barton pot process but rather discloses a process for making "lead compounds" by discharging air or other gases into and through a molten lead bath in a kettle. The patent discloses that temperature conditions of the reaction have a bearing upon the "degree of oxidation" of the lead. Since the Braselton patent has little bearing upon the specific process of the Mayer patent for achieving control of the temperature conditions, we shall focus our discussion upon Metals Refining Company and the Ishimura patent.

The District Court found as follows concerning the operations of Metals Refining Company prior to the patent in suit:

"20.

"Metals Refining Company, a stranger to this action, at Hammond, Indiana, used Barton pots and the conventional Barton pot process to make battery oxide from about 1924

2. Ishimura Patent 1,961,296; Braselton Patent 1,734,285;

Wilhelm Patent, supra, Footnote 1.

to 1951 by it and its successor, in ordinary commercial operations. The Barton pot equipment so used by Metals Refining Company was substantially the same as that used by the plaintiff at its Bradley Plant, including a pyrometer in the Barton pot for indicating the temperature therein. In the operation of such Barton pots by Metals Refining Company, molten lead was continuously fed from the melting pot to the Barton pot, the feed being controlled by inserting or removing a stopper from the connecting trough. The feed of molten lead to the Barton pot was varied to control the temperature in the Barton pot and the nature of the product. Metals Refining Company in such use operated within a gross temperature range of 650°F. to 950°F. and they tried to hold the temperature within a variation of 50°F. for any desired product. Such operation would continue from two to seven days without any shutdown. Such operations by Metals Refining Company were prior to the alleged invention of the Mayer patent in suit. The evidence establishes that, prior to the alleged invention of the Mayer patent, the personnel at Metals Refining Company knew that in operating a conventional Barton pot in the manufacture of battery oxide, the temperature in the pot determines the composition of the product and that such temperature could be controlled by varying the rate of feed of molten lead to the pot, and Metals Refining Company used such knowledge in controlling the operation of its Barton pots. There is no evidence that the Patent Office, in considering the application for the Mayer patent in suit, was aware of * * * such knowledge and use by Metals Refining Company * * *."

Plaintiff contends that the foregoing finding of the District Court is clearly erroneous because the evidence of the Metals Refining Company's operations consists of the depositions of three witnesses testifying from memory about remote events. The defendant's evidence on this issue being in the form of depositions, there is no presumption in favor of the District Court's findings thereon. Paraffine Companies v. McEverlast, Inc., 84 F.2d 335 (9th Cir. 1936). Upon examination of those depositions, we conclude that in so far as they relate to controlling temperature reaction by varying the feed of lead, and in the absence of contradictory evidence, the depositions discharge defendant's burden of proof on the issue of prior public use. Paraffine Companies v. McEverlast, Inc., supra.

The Ishimura patent relates to the Shimadzu process of producing lead oxide and fine particles of unoxidized lead for lead batteries. Only the tetragonal form of lead oxide is produced. The Shimadzu process consists of tumbling solid lumps of lead in a ball mill to produce by mechanical attrition a fine lead powder. An air current oxidizes a portion of this powder, carries the oxidized and unoxidized particles to a collecting chamber, and tends to cool the oxidizing apparatus. Ishmura required temperature control in order to operate the ball mill at the highest attainable temperature short of the melting point of lead. The pertinent teachings of the Ishimura patent are as follows:

"* * * A pyrometer 63 of which the termocouple is suitable (sic) placed inside of the mill 26 as shown in Figure 7, indicates the working temperature of the mill and is useful in controlling the temperature to keep it within desired limits. It being understood that the temperature in the mill may be varied by varying the speed at which the mill is run or the speed at which the lead lumps are fed to the mill or by varying the air supply.

* * *

"The mill should be operated at a certain temperature limit to produce the required uniform product.

"This may be accomplished either by controlling the amount of charge in the mill or by regulating the amount of air passing through the mill. But the temperature of the mill can be more easily controlled by the amount of charge of lead lumps into the mill.

"By using a thermo-couple 63 in the mill to indicate the temperature and employing means to cut off the motor operating the lead bar making and feeding mechanisms, when the mill temperature exceeds a prescribed limit the temperature may be kept down. On the other hand if the temperature of the mill drops beyond its lower limit, the motor operating the mechanism may be changed to regulate the feed of the lead lumps into the mill, thus providing for operation of the mill at any required range of temperature.

\* \* \*

"[claim 8.] The process of making suboxide lead powder which comprises feeding lumps of lead into a tumbling mill regulating the rate of feed of the lumps by the temperature of the mill, blowing out the powder resulting from tumbling the lead lumps in the mill as soon as the lead powder is eroded from the lumps and immediately cooling the suboxide powder by passing it through a water cooled jacket to prevent further oxidation."

Although the ball mill and Barton pot are different in some respects, they are analogous in function (apparatus in which lead is oxidized) in competitive processes of the same art (manufacture of lead oxide for lead storage batteries). The ball mill is sufficiently analogous to the Barton pot to permit us to consider the Ishimura patent as part of the state of the art prior to the alleged invention. "The test of the identity of processes is not the apparatus used for carrying them out but whether they involve identical or equivalent steps." Celite Corporation v. Dicalite Co., 96 F.2d 242 (9th Cir. 1938).

The determinative principle to be applied in deciding the issue before us is stated in 35 U.S.C. § 103:

"A patent may not be obtained \* \* \* if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

Whereas the differences between the two processes tend to support plaintiff's assertion that the Ishimura patent does not "anticipate" the Mayer patent, that assertion does not meet the defense of "lack of invention." The distinction between these defenses is inherent in the above quoted statutory provision and is noted in Stauffer v. Slenderella Systems of California, 254 F.2d 127 at 128 (9th Cir. 1957):

"Anticipation is strictly a technical defense. Unless all of the same elements are found in exactly the same situation and united in the same way to perform the identical function in a prior pleaded patent, there is no anticipation.

"The advances in the prior art may be such that, although there is no strict anticipation and even though the devices involved may not be similar, a trained mechanic would, if presented with the problem, solve it without difficulty."

If, as plaintiff insists, Ishimura fails to teach any operating temperature limits, or teaches temperature control for the purpose of obtaining a high yield rather than uniformity of the product, such matters relate to Mayer's discoveries which are by themselves unpatentable. The process of controlling temperature of the oxidizing apparatus by varying the rate of feed of lead thereto is clearly disclosed by the Ishimura patent.

Plaintiff contends that the Mayer patent teaches not only a continuous, but varying, feed of molten lead to the Barton pot, but also a continuous operation

of the Barton pot process, which obviates the disadvantages of frequent shutdowns. There was testimony that prior to the use of the Mayer process at plaintiff's Bradley Plant there were shutdowns as many as fifteen or twenty times per week for "cleanouts," but that after the Mayer patent was utilized at the Bradley Plant the Barton pots could be operated on a twenty-four hour basis for as long as a week without shutdown. But the patent's only reference to a continuous operation is in the first sentence of claim 2, "Process for continuously producing a mixture composed of, etc." Nowhere does the patent specify what is meant by continuous nor is any suggestion made therein of the duration of time which the term "continuous" is intended to connote. If an indefinite operation is intended, the process obviously does not achieve it; if something less is intended, the patent does not specify it with certainty. There was evidence that the Barton pot process could run continuously for a few minutes to produce a three pound sample of oxide, a few hours at the Bradley Plant prior to the patent and a few days at Metals Refining Company. The British patent to Pope specifies a a continuous operation. It is not surprising that the district court made no finding of fact supporting plaintiff's assertion.

Plaintiff asserts as indicia of invention the familiar elements of "commercial success" and fulfillment of a "long felt need." The office of these factors in the determination of patent validity is noted in the Stauffer case 254 F.2d at page 128. The presence or absence of such factors in the instant case, however, is more a product of the arguments of counsel than of evidence in the record. In the District Court plaintiff asserted that the presence of these factors is manifest in: the history of the Barton pot process and its imperfections; the alleged competitive advantage of the Shimadzu process over the Barton pot process prior to the advent of the patent; an alleged reversal in competitive advantage after the patent;

the elimination by virtue of the Mayer process of certain steps wherein the Barton pot product was analyzed, sorted and blended to attain a uniform product; and the high rate of production of battery oxides experienced by plaintiff and its affiliate in "the last few years." The defendant urged that the evidence is insufficient to establish a correlation between the patent and the alleged commercial success since: there is no evidence as to plaintiff's sales by years; there is no evidence permitting a quantitative comparison of plaintiff's sales before and after the patent; the evidence shows only an increase in plaintiff's production in "the last few years" although plaintiff started to use the Mayer process in 1937; there is no evidence that anyone, other than the parties to the action and plaintiff's subsidiary, has used the process of the patent; and there is no direct evidence as to what savings or increase in efficiency resulted from the elimination of the sorting and blending steps. Defendant did not attempt to prove that plaintiff's increase in production in recent years was attributable to some factor other than the Mayer process. The correlation between the patent and the badges of success was thus left to inference. The "long felt need" was left to inference from certain attempts to improve the Barton pot process in patents not necessarily related to the Mayer process. The District Court drew the inferences contrary to plaintiff's position. Those inferences not being unreasonable in view of the record, the District Court's findings thereon are not clearly erroneous and shall not be disturbed.

Since we agree with the District Court that claim 2 of the Mayer patent is invalid for lack of invention, we do not reach the issue relating to overclaiming and indefiniteness, nor the issues presented by defendant's cross-appeal relating to infringement and laches. Although plaintiff, in its reply brief, considers moot the District Court's finding that claim 1 of the patent is invalid, such

was nevertheless specified as error. Claim 1 is necessarily invalid if claim 2 is invalid.

The judgment of the District Court is affirmed.