VITAMIN TECHNOLOGISTS, Inc., v. WIS-
CONSIN ALUMNI RESEARCH
FOUNDATION.

WISCONSIN ALUMNI RESEARCH FOUN-
DATION v. VITAMIN TECHNOLO-
GISTS, Inc., et al.

No. 10079.

Circuit Court of Appeals, Ninth Circuit.

Nov. 24, 1944.

On Petition for Rehearing and Motion to
Remand Jan. 24, 1945.

As Amended Feb. 1, 1945.

942

R. Welton Whann and Robert M. Mc-Manigal, both of Los Angeles, Cal., for Vitamin Technologists, Inc.

George I. Haight, Frank Parker Davis, and Ward Ross, all of Chicago, Ill. (Lewis W. Andrews, of Los Angeles, Cal., of counsel) for Wisconsin Alumni Research Foundation.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

Appellee Wisconsin Alumni Research Foundation brought its complaint below alleging that appellant Vitamin Technologists, Inc., and H. F. B. Roessler, one of appellant's employees, were making an infringing use of a process of producing vitamin D by activating ergosterol and yeast, claimed to be organic substances of dietary value, with the ultra violet rays of the spectrum, produced by a mercury vapor lamp, a use of the rays claimed to be in violation of one or another of three patents, Nos. 1,680,818, 1,871,136 and 2,057,399.

Their filing dates are, respectively, June 30, 1924, December 27, 1926, and May 14, 1932. The patents were granted August 14, 1928, August 9, 1932, and October 13, 1936.

These patents were secured by Dr. Steenbock of the faculty of the University of Wisconsin and assigned to appellee. They are hereafter referred to as the first, second and third patents in the order of their dates of patenting. The second patent is claimed to be an extension in part of the first patent and the third patent such a continuation of the second. Infringements of product claims of the patents were also alleged.

Appellant answered claiming unclean hands, laches, invalidity of the claims on their face, and anticipation. The district court found the challenged claims valid and adjudged infringements by appellant both as to the process and its products and the court's interlocutory judgment ordered a perpetual injunction. This appeal followed. The district court also held that Roessler did not infringe, from which decision Wisconsin Alumni Research Foundation took an appeal. As to the latter appeal, our holding as to the invalidity of the patents requires an affirmance of the judgment.

The application for the first patent specifies the claimed discovery of a new process of producing vitamin D in such dietary substances by exposing them to the ultra violet rays of the spectrum. The process is of great value to mammalian animals, including human beings, and to poultry. Its contribution to the cure or amelioration of rickets is admitted by all the parties and proved by the testimony.

Many plant and animal foods of man and other animals contain no vitamin D, or less than is necessary in the diet composed of them, properly to support the bone forming functions of the body. Mammals whose food has this deficiency suffer from rickets. Many such foods, however, contain constituents called pro-vitamin D which when exposed to the ultra violet rays of the spectrum develop through their radiation the vitamin D in quantities sufficient to increase the body's bone metabolism.

This pro-vitamin, called a lipoid, is contained as a part of the fat-like material of some animal substances. Similarly in green vegetable material and in the oil of the meat of the coconut and certain other vegetable oils there exist such lipoids containing the pro-vitamin of vitamin D. In the ancient process of soap making from fatty materials there is an unsaponifiable part in

which the pro-vitamin is mainly, if not entirely, contained.

The phrase "organic substances of *dietary value*" of claim 1 of the first patent is much broader than the phrase "foods customarily eaten." If of dietary value the broader phrase covers yeast and activated unsaponifiable lipoids *extracted* from animal or vegetable foods, as described in the specifications of the first patent, as follows:

"In the oils and fats, it appears that the unsaponifiable constituents may be highly activated; and these unsaponifiable lipoids may be separated from the saponifiable fats. The activation of the lipoids may be effected either before or after separation from the saponifiable fats or constituents. For example, olive oil may be activated by subjecting it to the action of the ultra violet rays; the activated oil may be saponified by boiling it thirty minutes in a 20% solution of KOH in alcohol; the material may then be diluted with water; the unsaponifiable substances may be extracted with ether; the extract in ether may be washed; and the ether solution may be mixed with food and the ether evaporated, or allowed to evaporate. The result is to impart to the food the antirachitic property * * *. Other substances relatively rich in lipoids may be employed for the purpose of obtaining extracts, or concentrated activated material * * *."

Several of the infringements found by the district court consist of appellant's use of the patent's claimed process of projecting ultra violet rays produced by a quartz mercury vapor lamp to irradiate and create vitamin D in ergosterol. Ergosterol is a concentrated extract of unsaponifiable lipoids, derived from animal and vegetable food substances. Other infringements held are in so activating such lipoids in yeast. The district court held on sufficient evidence that both ergosterol and yeast are "organic substances of dietary value," as that phrase is used in claim 1 of the first patent. The possession and sale of the products of so processing ergosterol and yeast were also held to infringe.

A. THE SUCCESS OF THE MONOPOLY OF THE AID TO OR CURE OF THE RACHITIC.

Appellee contends that all the claims obtain support from the commercial success of the monopoly granted. It describes the great number of children suffering from malformation of their bodies due to the defective bone metabolism. The record contains pathetic pictures of such malformations and statistics of the large numbers of such unfortunates. Other maturer sufferers are described, all proving the great numbers of afflicted who, ex necessitate if they are to use such a boon to humanity, have been customers of the licensees of appellee. From the appellee's business manager it appears that it was largely from need of the poor that the business was supported. He testified

"Q. In what classes of people do you find, according to your information, that rickets is more prevalent? A. It is my understanding that rickets is found to a great extent in the so-called poorer class of people."

We take notice of the future continuance of the poor and of others afflicted and that such customers are excluded by the patents, if valid, from any unlicensed source of the remedy of foods so irradiated to contain vitamin D.

█ Dr. Steenbock's continuing interest in the management of appellee's business is apparent from his testimony regarding the refusal of licensing of the irradiation of oleomargarine, one of the foods of the poor, with the antirachitic vitamin D. His testimony in this regard is relevant to the issue, later considered, of an inequitable misuse of the monopoly of the patent as warranting the denial of equitable relief. Cf. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 492, 62 S.Ct. 402, 86 L.Ed. 363. It is

"Q. Do any of your licensees in this country irradiate or fortify oleomargarine under your process? A. No,—no, in general, *we* have been unsympathetic with those developments." (Emphasis supplied.)

Appellee has shown its receipts from its licenses to December 31, 1939, to be $7,478,-558, of which Dr. Steenbock received or was allocated $760,000. Under its vigorous business management the profits gradually increased and in the last five years of the period the amount of income from its licenses averaged $990,000 per year. The larger payments of the afflicted to the licensees are not shown.

Part of the income is used for advertising to expand the business and profits and part of the remainder for research in natural science of an undisclosed character by the University of Wisconsin, a state of powerful vested interests in dairy enterprises, to which no profits from the declined

944

oleomargarine irradiation afford support. An undisclosed part of Dr. Steenbock's share is used in scientific research. He states that other moneys he had received from the appellee are its payments to him for services to the Foundation after the transfer of the patents.

We agree that it has been shown that the monopoly on this aid or cure of the rachitic has been a commercial success which well warrants the consideration of the court. Apart from its legal implications, the large financial returns from such a profit-controlled monopoly barrier between the great numbers of the afflicted and their potent remedy is an interesting episode in the history of the law of patents. The testimony offered by appellee in this connection shows appellee's business manager's claim that its paid service of examination of some of the radiated foods tends to make a better product. Cf. Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 460, 60 S.Ct. 618, 84 L.Ed. 852. It may be observed that the same argument could be made for the monopolization of the production of quinine and digitalis.

However, we do not agree that such commercial success overcomes either the unclean hands and laches or the invalidity of the first two patents, later discussed.

B. APPELLANT'S CLAIM THAT IN ANY EVENT RELIEF SHOULD BE DENIED BECAUSE THE WISCONSIN CORPORATION USES ITS PROPERTY IN THE PATENTS AGAINST THE PUBLIC INTEREST.

HEREIN CONSIDERATION OF THE REFUSAL TO USE THE PATENTED PROCESS TO IRRADIATE OLEOMARGARINE AS AGAINST THE INTEREST OF THE PUBLIC IN THE HEALTH OF ITS CITIZENS.

■ It is now well established that a patentee may not put his property in the patent to a use contra to the public interest. The grant of a patent is the grant of a special privilege "to promote the Progress of Science and useful Arts." Const. Art. I, § 8. However, as stated in Mercoid Corp. v. Mid-Continent Inv. Co., 320 U.S. 661, 665, 64 S.Ct. 268, 271, it is not the private use but

"* * * the public interest which is dominant in the patent system. Pennock v. Dialogue, 2 Pet. 1, 7 L.Ed. 327; Kendall v. Winsor, 21 How. 322, 329, 16 L.Ed. 165; Adams v. Burke, 17 Wall. 453, 21 L. Ed. 700; Motion-Picture Co. v. Universal Film Co., supra, 243 U.S. pp. 510–511,

37 S.Ct. [416], 61 L.Ed. 871, L.R.A.1917A, 1187, Ann.Cas.1918A, 959; Morton Salt Co. v. G. S. Suppiger Co. [314 U.S. 488, 493, 62 S.Ct. 402, 86 L.Ed. 363]; United States v. Masonite Corp., 316 U.S. 265, 278, 62 S.Ct. 1070, 1077, 86 L.Ed. 1461. * * * The patent is a privilege. But it is a privilege which is conditioned by a public purpose. * * *"

■ The record contains several of the license agreements of the Wisconsin corporation which appellant claims have extended the monopoly of the patent over material not covered by the patent as in United States v. Masonite Co. and Mercoid Corp. v. Mid-Continent Co., supra. In the latter case the relief of injunction was refused a patentee because the owner of the patent, the Mid-Continent Co., required its licensee to pay royalties on an unpatented article which was an element in the patented article, the court saying (320 U.S. page 670, 64 S.Ct. 273),

"Respondents ask the equity court for an injunction against infringement by petitioner of the patent in question and for an accounting. Should such a decree be entered, the Court would be placing its imprimatur on a scheme which involves a misuse of the patent privilege and a violation of the antitrust laws. It would aid in the consummation of a conspiracy to expand a patent beyond its legitimate scope. But patentees and licensees cannot secure aid from the court to bring such an event to pass, 'unless it is in accordance with policy to grant that help.' Beasley v. Texas & Pacific R. Co., 191 U.S. 492, 497. 24 S.Ct. 164, 166, 48 L. Ed. 274. And the determination of that policy is not 'at the mercy' of the parties (Id. 191 U.S. page 498, 24 S.Ct. page 166, 48 L.Ed. 274) nor dependent on the usual rules governing the settlement of private litigation. 'Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.' Virginian R. Co. v. System Federation, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789. 'Where an important public interest would be prejudiced,' the reasons for denying injunctive relief 'may be compelling.' City of Harrisonville v. U. S. Dickey Clay Mfg. Co., 289 U.S. 334, 338, 53 S.Ct. 602, 603, 77 L.Ed. 1208. And see United States v. Morgan, 307 U.S. 183, 194, 59 S.Ct. 795, 801, 83 L.Ed. 1211. That is the principle which has led this Court in the past to with-

hold aid from a patentee in suits for either direct or indirect infringement where the patent was being misused. Morton Salt Co. v. G. S. Suppiger Co., supra, 314 U.S. page 492, 62 S.Ct. [402], 86 L.Ed. 363 * * *."

In a license agreement of August 8, 1928, between the Fleischmann Company and the Wisconsin corporation, the following provision appears:

"The Foundation grants the Company * * * the following rights and licenses * * *

C. The exclusive right and license to make and the *exclusive* right and *license to sell,* but only to other licensees of the Foundation, *yeast and yeast products,* as defined in Paragraphs A and B above, *but unactivated,* for use as a source of antirachitically activatable unsaponifiable lipoids for antirachitic activation * * *." (Emphasis supplied.)

This contract was assigned to Standard Brands, and many times modified. It does not appear that this provision has ever been changed. Here is a clear violation of the principle established in the Mercoid Corp. and Masonite cases, supra. Cf. Carbice Corp. v. American Patents Corp., 283 U.S. 27, 31, 51 S.Ct. 334, 75 L.Ed. 819; Leitch Manufacturing Co. v. Barber Co., 302 U. S. 458, 463, 58 S.Ct. 288, 82 L.Ed. 371; Motion Picture Patents Co. v. Universal Film Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959.

The court also notes, sua sponte, as a tribunal concerned that equitable processes not be used contra to the public interest, a matter in which the court is not "at the mercy" of the parties,[1] that in a subsequent agreement with Standard Brands it was agreed that the licensee should not incorporate its activated yeast products into oleomargarine. The specific words are that Standard Brands "shall not use or sell such activated yeast products for incorporation in the following products viz. margarine * * *."

A similar provision so excepting margarine appears in a license to one Kovacs, "except with the written consent of the licensor." These provisions of the licenses are relevant to Dr. Steenbock's testimony, supra, that none of the licensees had irradiated or fortified oleomargarine under the licenses because the Wisconsin corporation is unsympathetic with those developments."

This raises the question, not argued, whether the effect on the public health of refusing to the users of oleomargarine, the butter of the poor, the right to have such a food irradiated by the patented process is against the public interest. As seen, the general business manager of the Wisconsin corporation testified that it is the poor people suffering with rickets who constitute the principal market for appellee's monopolized processes and products. The evidence and appellee's briefs are replete with well verified statements of the great boon to humanity of Dr. Steenbock's scientific discoveries for the prevention and cure of rickets. The truth of such statements make the stronger the contention that it is a public offense to withhold such processes from any of the principal foods of the rachitic poor, or, indeed, from those of any such sufferers.

So important is oleomargarine in the diet of certain European countries that, Dr. Steenbock states, it is required by law to be fortified with vitamin D. His testimony is

"A. * * * Some of the European countries have imposed legal requirements for Vitamin D in oleomargarine, and these are being made in part by the irradiation process, but through the incorporation of these concentrates rather than the irradiation of the fats as such."

We judicially notice the legislation in Wisconsin[2] and other states of large

---

[1] Beasley v. Texas & Pacific Ry. Co., 191 U.S. 492, 498, 24 S.Ct. 164, 48 L. Ed. 274.

[2] The state's law on this subject is contained in Section 97.42 of the Wisconsin Statutes [1943]. Commercial dealings without a license are prohibited.

There is a "tax" for an annual license of $1,000 for a manufacturer; $500 for wholesale dealers; $25 for retail dealers and hotel and restaurant proprietors, and $5 for boarding house, bakery and confectionary proprietors. Subsection (3).

Subsection (7) provides for an elaborate system of records of transfers to be kept by licensees.

"With the filing of the records prescribed by subsection (7), each retail dealer shall pay a tax in the amount of fifteen cents per pound on oleomargarine, butterine and other similar substance sold; each hotel, restaurant, boarding house, bakery, and confectionary shall pay a tax in the amount of fifteen cents

vested interests in dairying imposing heavy restrictions upon the competition of oleomargarine with butter. Various devices are used such as taxation of oleomargarine itself, on its sale, in license fees of its vendors and the like penalties for violation of the restrictions. We take it, however, that such restrictive legislation does not require us to disregard its value as a food, so attractive and so satisfying to the human palate. Indeed, in these days of war restricted diet, oleomargarine has become the butter of the well-to-do and the rich.

The successful activation of oleomargarine and its fortification by irradiated material are described in the first patent and covered by its claim 1. Such irradiation of oleomargarine or its fortification by irradiated material is made a subject-matter of the second, a continuation in part, patent. That patent specifies that the first patent's "claims are included herein for subject-matter originally disclosed in the application here mentioned." It is also covered by the product claim of the second patent. It is thus seen that none but the licensees of this Wisconsin corporation or the corporation itself may either irradiate vitamin D into oleomargarine or fortify it with vitamin D by compounding it with an extract so irradiated and it appears that none of these is permitted so to do.

Suppression of the use of the property in a patent has often been held the right of the holder of the patent monopoly, but the question has not been raised in connection with the public interest in restoring the health of the afflicted. An early case, reviewing many others, on the question of suppressing the use of a patent against the public interest is Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122. There it is held that the suppression of the use of a patent for paper bags was not against the public interest, but the Court's opinion, 210 U.S. at page 430, 28 S.Ct. at page 756, concludes with this statement

"* * * Whether, however, a case cannot arise where, regarding the situation of the parties in view of the public interest, a court of equity might be justified in withholding relief by injunction, we do not decide."

In the last decade, in the many cases cited above and in others, the relief of a court of equity has been denied because of the conduct of the patentee with reference to his monopoly property, against the public interest. We know of no case in the Supreme Court since the Paper Bag case, supra, which has considered the patentee's refusal to license the use of its patent to protect the health of great numbers of the public such as are here shown to be suffering with rickets. It is strongly arguable that such a suppression of the patent's use is vastly more against the public interest than its use for a mere control of prices as in United States v. Masonite Corp., supra, or the tieing of unpatented material in Mercoid Corp. v. Mid-Continent Co., supra.

Appellant claims that the Wisconsin corporation is shown to have unclean hands, by selecting as typical two of the many license agreements in the record—those with the Commander Larrabee Company and with Kovacs. Appellant claims with regard to these (a) that they control resale prices and (b) that they control the potency of vitamin D in the products of vitamin D processing under claim 5 of the second patent, stated infra.

■ While recognizing the duty of the court, sua sponte, to protect the public interest, regardless of the contentions of the parties, this also falls within the functions of the Attorney General. United States v. Masonite Corp., supra. The matters above considered are suggested to him. In this we follow the practice pursued where a public offense appears to have been disclosed, for instance, perjury in a civil or criminal proceeding. Since our consideration of the record convinces us that the

---

per pound on such products * * * except such of said products as shall be purchased or received from a licensed retail dealer who is liable for tax hereunder." Subsection (8). "In order to prevent evasion of the per pound tax imposed by this section," subsection (9) provides a separate licensing system and a tax of six cents per pound on the use of oleomargarine not purchased from a retail dealer within the state.

Violation of the section subjects the violator to a forfeiture of one hundred dollars for each quarter year during which a violation occurs. Subsection (11) (b). Alternatively, section 97.72 provides for punishment by fine or imprisonment, with a penalty for subsequent violations ranging up to one thousand dollars fine or imprisonment in the county jail for one year.

patents are invalid, we have concluded that equity will best be served by disposing of the case on that ground.

C. CLAIMS 1, 2, 3 AND 8 OF THE FIRST PATENT ARE INVALID BECAUSE ANTICIPATED BY IMMEMORIAL AGRICULTURAL AND HORTICULTURAL PROCESSES AND THE PRIOR ART.

The specification of the claimed invention of the first patent is

"According to the present invention, feeds for animals, and food products for man, and medicines for man and animals, may have imparted to them the antirachitic factor, or may be rendered antirachitically active by subjecting them to the action of actinic rays and especially the rays in the region of the ultra violet rays of the spectrum, *such as* emanate from a mercury vapor lamp. The activation is very readily effected by means of a quartz mercury vapor light, though the open flame carbon arc, *or other source of light* may be employed in effecting the activation." (Emphasis supplied.)

Typical of claims 1, 2, 3 and 8[3] of the first patent held valid by the district court is claim 1, reading

"1. The process of imparting antirachitic properties to organic substances of dietary value (for example carbon-hydrate foods, fats, oils, protein foods, or composite foods), which comprises subjecting the same to the action of the ultra-violet rays, such as are produced by a quartz mercury vapour lamp, for a period sufficient to effect antirachitic activation but so limited as to avoid subsequent substantial injury of the antirachitic principle."

The sun is an "other source of light [which] may be employed in effecting the activation" of vitamin D. The ultra violet rays of the sun are "such as" produced by the lamp. Following United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 233, 63 S.Ct. 165, 87 L.Ed. 232, we construe these terms in the light of the testimony of the inventor, Dr. Steenbock. He testified regarding these phrases in the specification

"Q. Now, on page 4 [of the first application] you state that: 'The activation is very readily effected by means of a quartz mercury vapor light, though the open flame carbon arc, or other source of light may be employed in effecting the activation.' Now, prior to the filing of the application, you had tried the mercury vapor lamp? A. Yes.

"Q. In your experimental work? A. Yes.

"Q. Had you tried the open flame arc? A. No, I don't believe I had.

"Q. Had you tried any other source of light? A. I tried sunlight.

"Q. What results did you get with sunlight? A. I got activation.

"Q. Now, when you used the expression, 'or other source of light may be employed in effecting the activation,' what source did you at that time have in mind? A. Why, any source that could produce ultra violet radiation."

His assertion that his specification was intended to include solar radiation is

"Q. When making your tests did you form any conclusions as to what rays were reaching the substance? A. No. I wasn't concerned with that, because I was using ultra violet.

"Q. You didn't know whether all of them reached the substance or not? A. No, I wasn't concerned with it, as long as I got the effect. I knew I could get it at 2 feet, and shorter distance and longer distance; *even get it coming from the sun,* coming for millions of miles.

"Q. I take it then there was nothing critical in the distance of the material from the source of the light? A. I certainly wouldn't want to limit myself to any particular distance *or any particular intensity* and any particular time, when I had such a great variety of compounds which I had every reason to expect would require different treatment with respect to these conditions. *Why should I limit myself?* I was proving a fundamental principle, making my invention on that basis." (Emphasis supplied.)

---

3 "2. The process set forth in claim 1 as applied to oils and fats containing unsaponifiable lipoids."
"3. The process set forth in claim 1 as applied to naturally liquid glycerides."
"8. The process of imparting antirachitic properties to organic substances of dietary value (for example carbohydrate foods, fats, oils, protein foods, or composite foods), which comprises subjecting the same to the action of ultra-violet rays, such as are produced by a quartz mercury vapour lamp, for a period sufficient to effect antirachitic activation but so limited as to avoid subsequent substantial injury to either the antirachitic principle or the palatability."

948

Appellee followed Steenbock's claim of solar radiation and in July, 1929, filed a suit against the Solar Research Corporation, engaged in the manufacture of what it called Solar Irradiated Ergosterol, for infringing the first patent. The suit was maintained for over four years and dismissed because of the bankruptcy of the defendant.

Pressed in the present litigation and contrary to the testimony and the infringement suit appellee now claims that the patent's broad claims of solar radiation are to be construed in connection with the following statement in the specification

"Sunlight, of course, contains ultra violet rays, but it is not available practically for the production of the antirachitic principle. Artificial light rich in the rays of the ultra violet region of the spectrum is necessary * * *."

Assuming that the claim may be construed in the light of such a specification (Cf. General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 373, 58 S.Ct. 899, 82 L.Ed. 1402), we do not regard such an ambiguous statement as that the sun's rays are "not available practically" as an elimination of such rays from the broad claims if they are practically available. "Practically" may mean many things; notably economically practicable or biologically practicable. The infringer would not know, a matter considered infra.

The history of the introduction of the specification makes clear that it was not intended as a limitation on the claim. It was not in the application as filed. Its first appearance is in an amendment to that application. It was accompanied by a claim which limited the area of the patent to "artificially" produced rays of the ultra violet region of the spectrum. That claim read as follows:

"1. The process of imparting antirachitic properties to an organic substance which comprises subjecting the same to *artificially produced rays* of the ultra violet region of the spectrum for such period and with such intensity as to effect antirachitic activation and avoid injury to the product." (Emphasis supplied.)

In the patent as it finally emerged this claim so limited to artificially produced rays disappears and in its place is claim 1 with its all-inclusive phrase "ultra violet rays such as are produced" by the lamp.

Obviously, the present claim was intended to cover the solar radiation, claimed as infringed in the suit to restrain the production of solar irradiated ergosterol. Equally obvious that if the sun's rays had not been intended in the area of the monopoly, the limited claim would not have been abandoned and the all-inclusive one obtained. The broadening of the final claim was not by inadvertence, accident or mistake. 35 U.S.C.A. § 64.

It is an undisputed fact that man in all historic time has used the process of cutting hays, whereby, by oozing from the cuts, is extracted their pro-vitamin containing sap, which is exposed to sun irradiation, and copra, thus so exposing the pro-vitamin-containing coconut oil so extracted from the meat of that fruit. Thereby the sun's ultra violet rays have created vitamin D in such "carbohydrates," "organic substances of dietary value," covered by claim 1 of the first patent. Such hays fed to animals and copra, the food of both man and animals, aids or cures rachitic conditions in both classes of mammals. We refuse to entertain the absurd proposition that because the farmer and copra grower did not know the photo chemical process involved in their immemorial practice, they may be enjoined as infringers.

Assuming that Dr. Steenbock discovered, as he claims, that the sun's rays coming from millions of miles away could irradiate foods with vitamin D and that this was the reason, unknown to them, why farmers and coconut growers regarded their sun-cured hays and sun-dried copra were good foods, such a discovery does not entitle him to a patent on their processes.

This court has held that it is a well established principle that if a process is disclosed in a prior art, a patent whose validity is attacked is anticipated even though the prior patent failed to state and the inventor did not know that his invention brought the process into operation. In Celite Corp. v. Dicalite Co., 9 Cir., 96 F.2d 242, 248, we stated:

"* * * In answer to appellant's contention that the purpose of the North process was simply to remove organic matter and bleach the product, it is sufficient to state that, as the patented process in suit was disclosed by the North patent, it was anticipated by that process even though it be assumed that the North patent failed to state, and that North did not know, of the increased flow rate of the product produced. * * *"

In so holding we followed the principle established in Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 435, 436, 31 S.Ct. 444, 55 L.Ed. 527; DeForest Radio Co. v. General Electric Co., 283 U.S. 664, 682, 686, 51 S.Ct. 563, 75 L.Ed. 1339; In re Ebert, 19 C.C.P.A. (Patents) 1087, 57 F.2d 356, 357; In re Langdon, 22 C.C.P.A. (Patents) 1245, 77 F.2d 920, 923; In re Boyd, 24 C.C.P.A. (Patents) 1206, 90 F.2d 130, 132. Cf. Wall v. Leck, 9 Cir., 66 F. 552, 555.

The prior art in lamp radiation had been developed by investigators Goldblatt and Soames, who had irradiated rachitic rats, produced vitamin D, fed their livers to other rachitic rats and cured them of rickets. Steenbock knew of this discovery and his experiments with the lamp determined the scientific principles involved not so clearly seen by Goldblatt and Soames. Under the above cases, this discovery of the reason of a prior used process is not a patentable invention.

█ It thus appears that the claimed process of preparing food materials and exposing them to irradiation by ultra-violet rays from all sources has been anticipated from time immemorial by the farmer in hay curing in the sun and the coconut grower sun-drying the cut meat of the coconut. We hold that claims 1, 2, 3 and 8 of the first patent are invalid because of such anticipation. It was error to hold them valid and to enjoin appellant from irradiating yeast or ergosterol, "organic substances of dietary value," with ultra violet rays as infringing such claims.

D. THE PATENTS ARE NOT INVALID BECAUSE IN THE PROCESS OF PREPARING FOODS FOR EXPOSURE OF THEIR ACTIVITABLE LIPOIDS AND THEIR EXPOSURE TO THE ULTRA VIOLET RAYS OF THE SUN OR LAMP IS UTILIZED THE NATURAL FORCE OF SUNLIGHT OR A FORCE LIKE IT FROM THE LAMP.

█ Appellant also argues that the patents seek a monopoly of the ultra violet rays of the sun or lamp, a natural force, and are hence invalid under our decision in Wall v. Leck, 9 Cir., 66 F. 552. We do not agree.

Steenbock's claimed inventions include a use of the actinic light rays from the sun or the lamp, but as a part of a process which comprises the preparation of food substances so that all or part of their activatable content will be activated by exposure to such rays. Such process claims no more constitute a claim of monopoly of sunlight, than does the claim of a process patent for the use of a chemically prepared photographing plate or film to be photo chemically activated by light rays constitute a claim of a monopoly of light. As well could it have been said that the claim of the use of the pull of the earth on the weights of the first grandfather's clock constitutes a claim of monopoly of the force of gravity.

The ultra violet rays of the mercury vapor lamp are natural forces, like such rays in the sun's spectrum, in the sense there are no forces but those of nature of which man is a part. But their use when created by a lamp to activate the antirachitic principle in lipoids processed by exposure to the lamp rays, if not anticipated and properly claimed, is as patentable a process as the use for motor power of electricity created by a dynamo, though the electricity so created be identical with that of the lightning of an electric storm.

E. THE CLAIMS OF THE FIRST TWO PATENTS ARE INVALID BECAUSE OF INDEFINITENESS OF THE AREA OF THE CLAIMED MONOPOLY.

█ Assuming that Dr. Steenbock made a novel discovery of process and product, the discoveries, however valuable, do not automatically become patented by the filing of applications disclosing them. In addition to the disclosure, the applicant must "particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention and discovery," as required by 35 U.S.C.A. § 33. In United Carbon Co. v. Binney & Smith, 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232, in holding invalid a claim [4] because

---

[4] "1. Sustantially [Substantially] pure carbon black in the form of commercially uniform, comparatively small, rounded, smooth aggregates having a spongy or porous interior. 2. As an article of manufacture, a pellet of approximately one-sixteenth of an inch in diameter and formed of a porous mass of substantially pure carbon black." 317 U.S. pages 231–232, 63 S.Ct. page 167. Emphasis supplied.

The court noted that the phrase "approximately one-sixteenth of an inch in diameter" included "a variation from approximately 1/4th to 1/100th of an inch" (317 U.S. page 234, 63 S.Ct. page 168). This, as in the present appeal was determined by testimony of the inventor.

of the indefiniteness of the area of infringement, the Supreme Court followed General Electric Co. v. Appliance Wabash Corp., 304 U.S. 364, 369, 58 S.Ct. 899, 901, 82 L.Ed. 1402, which there states

"* * * Patents, *whether basic or for improvements,* must comply accurately and precisely with the statutory requirements as to claims of invention or discovery. The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others, and the assurance that the subject of the patent will be dedicated ultimately to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. The inventor must 'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.' The claims 'measure the invention.'" (Emphasis supplied.)

Appellant contends, and we agree with it, that the phrase of all the claims of the first and second patents, describing the function of exposure as "for a period *sufficient* to effect antirachitic activation but so limited as to avoid subsequent *substantial injury* to the antirachitic principle," is too vague and uncertain a description of the process to "inform the public * * * of the limits of the monopoly asserted."

It is obvious that the function of exposure to the lamp's rays "sufficient" to cause "substantial injury to the antirachitic principle," that is produce less vitamin D, may mean (a) a sufficient substantial functioning from the viewpoint of economic profit or (b) from the viewpoint of its dietary efficiency. Dr. Steenbock admits this in the following testimony which, as in the United Carbon case, supra, we consider *in construing* this particular phrase of the claims:

"* * * Obviously the term is used in different senses, because it may be substantial from an economic point of view, while from a physiological point of view it may not amount to very much. So I used the word 'substantial' to indicate destruction or injury of importance. Whether that importance might arise from economic considerations or physiological considerations or questions of expediency is immaterial."

*Further testifying he said*

"Q. Now, still referring to page 25 of the file wrapper, you state: 'On the other hand, if the lipoids be separated before treatment, it is found that the treatment can be prolonged through a period of many hours without destroying the antirachitic principles.' Now, when did you first determine this to be a fact? A. Well, I don't recall the exact time, but I found great differences in the ease with which induced activity was destroyed. The outstanding case, of course, was these oils,—olive oil, for example. When I took other materials such as the separated lipoids, why I found it would take exceedingly long to destroy all of them,—there was a reduction in activity, but to destroy all of it would take a very long time; and *so it got to be in my mind rather an economic proposition rather than a scientific proposition.* As I told you the other day, it is now known that the destruction begins to take place almost the same time or very soon after the first activation has taken place; *so it is a question of balance, as it were."* (Emphasis supplied.)

Also he testified:

"Q. Now, getting back to your definition of 'substantial injury of the antirachitic principle,' that term according to your meaning, might have different meanings according to the economic or physiological conditions which may be present in any situation? A. Yes.

"Q. And in one instance it might mean a reduction of 5 percent, while in another instance it might mean a reduction of injury of 50 to 75 percent? A. Yes."

Equally obvious are the uncertainties of the monopoly area claimed, whether from the standpoint of economic profit or dietary efficiency. As to economic substantial injury, one who successfully activates food by the ultra violet rays would not violate the patent if the ultra violet rays were used sufficiently to cause an economic loss; while another would infringe if he processed a slightly more activated food at an economic gain. Or assuming two producers of irradiated foods of the same degree of exposure on the borderline of substantial injury, one of whom is a skillful salesman, the other less so. The first makes an economic gain and infringes; the second an economic loss and hence cannot be enjoined from further production of irradiated foods.

Similarly as to the physiological effects of a 50 percent injury to the antirachitic factor from the function of over exposure, of which Dr. Steenbock speaks. If 50 percent injury be not substantial and 51 percent is substantial, the manufacturer of a product 51 percent injured by over exposure would not infringe.

There were many published ways in which the ultra violet rays were used to affect the chemistry of food prior to the filing of the first application on June 30, 1924. Prior thereto Goldblatt and Soames, in 1923, had published that the lamp's rays applied to living rats had produced in their livers an antirachitic factor which when fed to rachitic rats aided or cured their rickets. The lamp's rays were then used by Zilva to reduce or destroy vitamins A and B in certain foods. Hume and Smith were then using the lamp to irradiate air and succeeded in irradiating the sawdust, producing in it vitamin D, which rachitic rats ate and were cured. The rays were known to sterilize edible liquids such as beer, olive oil and milk. The process was patented in 1915. In all these and other developments of the prior art and patenting, none of those discovering or seeking to discover valuable uses of the lamp's rays could determine just where Dr. Steenbock's "sufficiency" of exposure would be infringed.

The constant advances in discovery of the valuable uses of the rays of twenty-five years of experimentation are a promise and not a negation of such advances in the future. If the menace of doubt as to the excluded area of exposure hang over the scientific world there would be the weakening of inventive energy in this field, considered in the United Carbon and General Electric cases, supra.

It is contended that there would be difficulty in stating with definiteness the amount of the functions of exposure which would be "sufficient" or "substantial." Such a difficulty shows the doubt which would affect the minds of all other investigators and prospective inventors in the field. The Supreme Court in General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 372-373, 58 S.Ct. 899, 903, 82 L.Ed. 1402, disposes of this contention, stating

"The Circuit Court of Appeals below suggested that 'In view of the difficulty, if not impossibility, of describing adequately a number of microscopic and heterogeneous shapes of crystals, it may be that Pacz made the best disclosure possible * * *.' * * * But Congress requires for the protection of the public, that the inventor set out a definite limitation of his patent; that condition must be satisfied before the monopoly is granted. The difficulty of making adequate description may have some bearing on the sufficiency of the description attempted, but it cannot justify a claim describing nothing new except perhaps in functional terms. It may be doubted whether one who discovers or invents a product he knows to be new will ever find it impossible to describe some aspect of its novelty."

Appellee claims that the General Electric and United Carbon cases are distinguishable because they involve improvements on prior patents, but the Supreme Court in the General Electric Co. case, supra, 304 U.S. at page 369, 58 S.Ct. at page 901, 82 L.Ed. 1402, states that the rule of definiteness of the monopoly area applies to "Patents, whether basic or for improvements."

Appellee claims that the patents in those cases are distinguishable because they were for products rather than processes. Here the product claims embody the process. There seems no distinction in principle between inadequate limitation of the monopoly area in such product and process claims.

We hold that Dr. Steenbock's patents No. 1,680,818 and No. 1,871,136 are also invalid because they fail to inform the public of the limits of the area of the claimed monopoly.

F. THE CLAIMS OF THE THIRD OR YEAST PATENT ARE INVALID BECAUSE OF LACHES.

The district court held valid and infringed claims 3 and 4 of the third patent. They are

"3. Antirachitically activated yeast which has been rendered antirachitically active by treatment with light rich in ultra-violet rays.

"4. A process which comprises antirachitically activating yeast by subjecting it to the action of artificially produced ultra-violet rays for a period sufficient to render said yeast antirachitically active."

Appellant concedes these claims are valid on their face and that, barring anticipation, they would have been valid if stated as claims following the specifications of the

discovery of the first patent, filed June 30, 1924.

Appellee's brief admits that Dr. Steenbock had successfully irradiated yeast prior to June 30, 1924, when the first application was filed. On August 13, 1925, before the patent was granted (August 14, 1928) claims directed to the activation of yeast were filed and later, on December 9, 1926, cancelled by an amendment filed. This was apparently on the objection that yeast was not an ordinary food and hence the claim was for new matter. No appeal was taken, though Dr. Steenbock contends that yeast is "an organic substance of dietary value" and covered by that phrase in claim 1 of the first application and asserts that appellant is infringing that claim. The record shows that in 1928, prior to the granting of the first patent, Fleishmann obtained a license from appellee to irradiate his yeast.

In appellee's second application, filed December 29, 1926, there was a disclosure of the activation of yeast with a claim for an activated yeast tablet. No objection to the claim was made and claims 3 and 4 of the third application could as well have been then made. Instead of this, the yeast tablet claim was voluntarily withdrawn (May 14, 1932). The second patent issued on August 9, 1932.

Coincident with the withdrawal of the yeast tablet claim, Dr. Steenbock filed a continuation in part application, his third, with the yeast claims 3 and 4, which as well could have been made in his second application and been granted in his second patent on August 9, 1932. Instead, by avoiding the patenting on that date and filing his third application, he postponed the patenting date and likewise his monopoly until October 13, 1936.

In the vernacular of a not remote past, the profitable antirachitic yeast was an "ace-in-the-hole" in the hand dealt when the discovery was made in 1924, but held until the showdown at the third application, eight years later.

In the meanwhile, as appellee's brief admits, Dr. Hess, in July 1927, published his discovery of the activation of yeast. That scientist gave it freely for the benefit of rachitic children, without seeking a monopoly profit.

The Supreme Court has held that such laches deprives one of his right to a patent, and what it has said applies a fortiori to withholding the use of a simple remedy for the widely prevalent affliction of rickets among children.

In Woodbridge v. United States, 263 U. S. 50, 56, 44 S.Ct. 45, 47, 68 L.Ed. 159, it was held that

"Any practice by the inventor and applicant for a patent through which he deliberately and without excuse postpones * * * the beginning of the terms of his monopoly, and thus puts off the free public enjoyment of the useful invention, is an evasion of the [patent law] and defeats its benevolent aim."

Webster Electric Co. v. Splitdorf Electrical Co., 264 U.S. 463, 466, 44 S.Ct. 342, 343, 68 L.Ed. 792, is another case in point. In that case two of the claims in litigation were presented to the Patent Office, by an amendment to a divisional application, eight years after the filing of the original application. In holding that the delay was unreasonable and the claims void because of laches in presenting them to the Patent Office, the Court said

" * * * but it is no less important that the law shall not be so loosely construed and enforced as to subvert its limitations, and bring about an undue extension of the patent monopoly against private and public rights. * * * "

In Wirebounds Patents Co. v. Saranac Automatic Machine Corp., 6 Cir., 65 F.2d 904, 905, the court held a method claim invalid for laches because of a delay of over seven years in filing method claims after the granting of a divisional application. After discussing Webster Electric Co. v. Splitdorf Electrical Co., supra; Chapman v. Wintroath, 252 U.S. 126, 40 S.Ct. 234, 64 L.Ed. 491, and Woodbridge v. United States, supra, the court stated [65 F.2d 906]

"The rationale of these three cases is that if the inventor, intentionally or by reason of culpable neglect, be guilty of action which unduly postpones the time when the public would be entitled to the free use of the invention, and thus defeats the policy of the patent law, the right to a patent will be lost." [5]

Claims 3 and 4 of patent No. 2,057,399 are invalid because of such laches.

---

[5] Cf. Ensten v. Simon Ascher & Co., Inc., 282 U.S. 445, 51 S.Ct. 207, 75 L.Ed. 453, where a delay in disclaiming prevented recovery.

For these reasons the complaint below should have been dismissed. The judgment in favor of appellee Wisconsin Alumni Research Foundation is reversed, and that in favor of H. F. B. Roessler is affirmed.

HEALY, Circuit Judge (concurring).

I agree with the result of the main opinion and with much that is said in it. I think, though, that we should confine ourselves to the issues actually presented by counsel. Further, it appears to me doubtful that the claims are fairly subject to the criticism that they broadly include a monopoly of the use of sunlight. The patents should be adjudged invalid on the less questionable ground of anticipation.

I do not doubt that Professor Steenbock is to be accounted a pioneer in his special field, namely, the artificial activation of vitamin D in foods. His researches illuminated some very dark places and brought about a clearer understanding of a natural phenomenon that before his time was seen as through a glass, darkly.

But I agree that Steenbock did not invent anything. The antirachitic properties of the vitamin D principle were well known, if imperfectly understood, prior to Steenbock. It had been recognized that these properties are present naturally and abundantly in various organic substances, notably in cod-liver oil. Vitamin D had also been produced in an artificial way by a process of irradiating living tissues with the mercury vapour lamp. As early as 1919 Huldschinsky had found that rickets could be cured by exposure of the patient to the ultra-violet rays either of the sun or of the lamp. Use of the lamp for activating vitamin D in inert substances, as distinguished from the activation of the principle in the living tissue of the patient himself, may possibly be another matter; and what is claimed for Steenbock is that he discovered or invented a process for the activation of the vitamin in edible substances through employment of this lamp, or similar available apparatus.

For the purpose of the discussion, I assume—although the validity of the assumption is dubious—that the activation of living tissues by exposing the patient to the ultra-violet rays of the mercury vapour lamp is a different process from that Steenbock is said to have invented. The one thing that can certainly be attributed to Steenbock is the conception—a truly remarkable conception in the then state of knowledge—that the artificial irradiation of certain foods with ultra-violate light confers upon the food the power of preventing the occurrence of rickets, or, to put it another way, produces vitamin D.

But recognition is not invention. In the use of this artificial process Steenbock was substantially anticipated by others laboring in the same general field. In 1923 Hume and Smith published a paper giving an account of their experiments with rats which had been rendered rachitic by placing them on a diet deficient in fat-soluble vitamins. The experiments were conducted in this manner: The rats were put in glass jars containing sawdust at the bottom. The animals were later removed from the jars, and the jars were placed below a mercury vapour quartz lamp so that the light shone directly down into them. After ten minutes these containers were covered with glass lids and were moved, whereupon the rats were put back in the jars and the covers temporarily replaced to hinder diffusion of the air. Thereafter the animals showed marked improvement in growth and weight, a result attributed by Hume and Smith to the irradiation of the air in the containers.

Steenbock was familiar with this experiment. After studies and experiments of his own he became convinced that the improvement in the condition of the rats was attributable, not to the irradiation of the air, but to the irradiation and consequent activation of the sawdust, which is edible to rats. In other words, Steenbock accurately interpreted the results of Hume and Smith's experiments, the significance of which the latter themselves failed to comprehend.

In the same year Goldblatt and Soames published an account of another experiment, with which, also, Steenbock was familiar. They irradiated live rats with a quartz mercury vapour lamp, after which the livers were removed and fed to rachitic rats, with resultant marked improvement in growth. Thus by these scientists as well as by Hume and Smith the actual process of irradiating edible substances with the mercury vapour lamp had already been practiced. There had been, besides, other practices of natural or artificial irradiation of dietary substances, some of which are mentioned in the main opinion. I think, therefore, that Steenbock can not fairly be said to be the originator of the process. His contribution to the art lies, rather, in his interpretation of the results that may

be achieved by the process. Compare Celite Corp. v. Dicalite Co., 9 Cir., 96 F.2d 242, 248.

I think the Steenbock patents are subject to an infirmity still more fundamental. Ultra-violet light is a natural form of energy. Like the sun, which is the source of that energy, and like the air we breathe, ultra-violet rays are the property of all mankind. Men may devise or improve machines for their more effective utilization and may obtain patents upon the machine or the improvement. But it would be a monstrous thing if the energy itself could be made the subject of a monopoly. It must be remembered that sunlight by its own inherent process activates the vitamin D principle in both inert and living tissues and substances, albeit, because of unfavorable atmospheric conditions, sunlight is not effective in all cases. Nevertheless it is clear that the artificial process differs in no essential particular from the natural one. The intervention of the mercury vapour lamp—developed long prior to Steenbock—may adapt the natural process to wider fields, but in a patentable sense the process itself is as ancient as the sun.

It seems to me doubtful that the claims should be held invalid because lacking in particularity in respect of the period of time of exposure. It may be that they are sufficiently specific to enable those skilled in the art to understand what is intended. I assume, therefore, that Steenbock discovered and sufficiently disclosed in his claims the most effective time period of exposure. Nevertheless such a discovery would not amount to a patentable invention. It would amount to no more than the ascertainment of a naked fact or principle in nature existing independently of the efforts of the discoverer. Cf. O'Reilly v. Morse, 15 How. 62, 14 L.Ed. 601; Tilghman v. Proctor, 102 U.S. 707, 722-729, 26 L.Ed. 279. If the discovery were patentable, it would be broader than the process itself in that it "would cover all processes which aim at the same result,"[1] including even the purposeful exposure of dietary substances to the direct rays of the sun.

Upon Petition for Rehearing and Upon Motion to Remand for Further Testimony in the District Court.

DENMAN, Circuit Judge.

In our opinion filed November 24, 1944, we called the Attorney General's attention to the refusal of the Wisconsin corporation to permit the vitamin D irradiation of oleomargarine. While claiming the beneficence of the vitamin in food in the cure or aid in cure of rickets in children, and pointing out that rickets is a disease of the poor, the Wisconsin corporation now seeks to justify the denial of irradiation of the "butter of the poor" spread on their bread or used as a fat in cooking of meats and vegetables.

At the hearing of the motion to recommit the case to the district court, it was admitted that in the 20 years since the application was filed, the only time the Wisconsin corporation has permitted the irradiation of oleomargarine was under the recent pressure of the war need and the demand of the Federal Government. This is although Dr. Steenbock, testifying in 1941, stated that the governments of European nations then *required* such irradiation.

An affidavit of Timothy Brown, a trustee of the Wisconsin corporation since 1925, when Dr. Steenbock transferred his patents to the Wisconsin corporation, is offered as the proof on a recommitment, if granted, of the justification for not permitting the licensing of the vitamin irradiation of oleomargarine. This it will be remembered was described as a successful process in the first patent applied for in 1924. That affidavit states

" * * * At the time Dr. Steenbock assigned his rights in the inventions upon which the patents in suit were granted, the assignment was accepted by appellee upon condition that irradiation or Vitamin D fortification of oleomargarine would not be licensed without the consent of the president of the University of Wisconsin."

At the hearing on the motion to recommit, it was admitted that the president of the University of Wisconsin in 1925 and those since have not been scientists. They were the administrative heads of a university supported by funds appropriated by the Wisconsin legislature. Constitution of Wisconsin, Art. X, Sec. 6; cf. §§ 20.39, 20.40 and 20.41, Wisconsin Statutes 1925.

That legislature, elected by a dairy state, then was and since has been one of the most hostile of the forty-eight states to the use of oleomargarine as a food. The history of its hostility shows it began as early as 1885 with continuing legislation. In the Wisconsin laws of that year, in chapter 361, that legislature prohibited the sale of any

---

[1] Walker on Patents, Deller's Ed., Vol. 1, p. 65.

substance "designed to take the place of butter or cheese, produced from pure, unadulterated milk." There were other laws discriminating against oleomargarine in the laws of Wisconsin. 1887, ch. 185; 1895, ch. 30, §§ 6 and 7; 1925, ch. 279.

In 1925, the year of the transfer of the patents, that legislature in a joint resolution memorialized Congress, reciting the large consumption of oleomargarine in the United States and its claimed adverse competitive effect upon the dairy farming industry in Wisconsin and elsewhere, and petitioned Congress to suppress the manufacture and sale of oleomargarine throughout the United States. The resolution read

" * * * That the Congress of the United States is hereby earnestly petitioned and urged to enact such legislation as shall prohibit the manufacture and sale of oleomargarine in the United States and that the representatives in Congress are requested to introduce some [sic] measures as may be necessary to accomplish such end; * * *." Laws of Wisconsin 1925, p. 717, Jt.Res. 77, A; cf. 1939, p. 1031, Jt.Res. 84.

In 1931 it passed a joint resolution seeking to hamper oleomargarine's use as a food by National restrictive legislation, on the ground that oleomargarine was *lacking in vitamins and hence not beneficial to children*. The resolution read

"Whereas, the most eminent scientists and food experts have proved and recognized the superiority of butter over oleomargarine as a food product, and have repeatedly pointed out the vital importance of the vitamin content of butter, absent from oleomargarine and other butter substitutes, to the health, growth and welfare of the children of the United States * * *."

Nevertheless, Scientist Steenbock gave to the presidents of the University of Wisconsin, dependent upon that legislature's funds, the sole power to add to oleomargarine by irradiation the vitamin D which that scientist claims is so valuable, if not essential, in the cure of rickets of the children of the forty-eight states; and the Wisconsin corporation accepted and administers the patents subject to such restraint on its beneficent use.

As stated, all these children of the whole Nation thus have been prevented from receiving the vitamin created by this process in the oleomargarine on the bread they eat or in the animal and vegetable foods which are cooked in that fat. At the hearing, on being questioned by one of the judges, the Wisconsin corporation admitted that children so fed oleomargarine on bread or foods so cooked would receive the antirachitic vitamin.

Though it is not contended that oleomargarine with vitamin addition is not "of equal effectiveness" compared with butter, the reason given for transferring to the University's presidents the power to inhibit its use is that some licensee might make *fraudulent* claims concerning such effectiveness. The affidavit reads:

"At the time there were many persons connected with the University of Wisconsin and particularly its School of Agriculture who were fearful of the possibility that if oleomargarine manufacturers were licensed under the Steenbock patents, fraudulent claims might be made by such manufacturers regarding the alleged equal effectiveness of oleomargarine when compared with butter. It was for these reasons that Dr. Steenbock made his assignment conditional upon appellee agreeing not to license the use of the patented processes in connection with oleomargarine without the consent of the president of the University of Wisconsin."

The Wisconsin corporation's briefs explain their inspection and direction of the advertising of the other irradiated food products of its licensees. It is not claimed that responsible licensed irradiators of oleomargarine would be any more likely to make *fraudulent* statements than the licensed irradiators of the many other foods allowed such irradiation.

Dr. Steenbock, when he testified at the trial below in 1941, was a member of the faculty of the University of Wisconsin of which its president is the head, and had been connected with that university since before 1925. He there stated regarding the established policy of licensing

"Q. Do any of your licensees in this country irradiate or fortify oleomargarine under your process? A. No,—no, in general, *we* have been unsympathetic with those developments." (Emphasis supplied.)

As would be expected in such a situation, the affidavit states that but one application for a license to irradiate oleomargarine was attempted to be obtained from the president of the University or the Wisconsin corporation. That is, until the Federal Government, under a war need, dared seek the use of the health giving process, despite

the antagonism of the Wisconsin legislature and "unsympathetic" attitude of the corporation, and it may be inferred, since they alone could permit such irradiation, of the university's presidents.

The affidavit also states that a committee of the American Medical Association had decided in 1937 that "for the present milk is the only fortified food which will be considered for acceptance when fortified by vitamin D." On the hearing the Wisconsin corporation admitted that all the other food substances licensed for irradiation, that is flour, crushed oats and other grains, yeast, ergosterol, etc., are not so considered by the committee. We are unable to see that the statement of this committee warrants the president's or corporation's refusal to irradiate oleomargarine.

The affidavit admits that under a regulation of the Federal Food, Drug, and Cosmetic Act, § 403, 21 U.S.C.A. § 343, oleomargarine may be fortified by vitamin A and vitamin D, the regulation providing

"(7) Vitamin A, added as fish liver oil or as a concentrate of Vitamin A from fish liver oil (with any accompanying Vitamin D and with or without added Vitamin D concentrate), in such quantity that the finished oleomargarine contains not less than 9,000 United States Pharmacopoeia Units of Vitamin A per pound." 6 Fed.Reg. 2761, 2763.

Since the quantity of the added vitamin D is not fixed by the regulation and may be "any accompanying" amount, we construe the word "accompanying" as including any vitamin D accompanying the irradiated oleomargarine when vitamin A is added. The Wisconsin corporation would construe the regulation otherwise, as if drawn to justify its refusal to license any such vitamin D irradiation. Its construction is that the direct vitamin D irradiation of oleomargarine, for which process the United States finally procured the right for its armed forces, is prohibited by the regulation. If this latter were the proper construction, it will be noted that the regulation was made not only after the filing of the instant suit

but after twenty years of refusal to permit a practical commercial experience in oleomargarine irradiation such as was given by the licenses to irradiate flour, rolled oats, yeast, etc. from which experience fixed limits of vitamin D content could be determined if such limitation were desired. The unlimited amount permitted by the regulation indicates no scientific or medical need for such limitation.

We now have before us from the Wisconsin corporation what, if the case be resubmitted, it will prove as excusing the refusal of the irradiation of oleomargarine. Upon consideration of the proffered evidence all three judges now conclude the refusal unwarranted and against the public interest and deny the motion to remand for proof of these facts. We further hold that such refusal to permit such irradiation warrants the refusal of the equitable injunctive and accounting relief sought by the corporation, though we hold the public interest is served better by our decision that the patents are invalid.

Appellant's briefs state, without contradiction by appellee in brief or at the hearing, that there was such a license agreement as described in the paragraph beginning first on page 13 of our opinion as printed. It is now conceded that the agreement does not appear in the exhibits in the record. It is therefore ordered (1) that that paragraph, of 15 lines, be stricken from the opinion; (2) that the first two lines of the paragraph next below be amended to read "Pressed in the present litigation and contrary to the testimony and the infringement suit, appellee now," and (3) that the first sentence of the paragraph beginning third on page 14 of the opinion as printed [146 F.2d 948] be amended to read "Obviously the present claim was intended to cover the solar radiation, claimed as infringed in the suit to restrain the production of solar irradiated ergosterol."

The motion to remand on other grounds, is without merit and is denied. The petition for rehearing is denied.